JUNTA DE RELACIONES DEL TRABAJO DE PUERTO RICO, peticionaria, *v.* INTERNATIONAL LONGSHOREMEN ASSOCIATION (ILA), DISTRICT COUNCIL OF THE PORTS OF PORTO RICO y su Presidente EUSEBIO G. MORENO y sus Uniones Locales Núms. 1740, 1782 y 1674 y sus respectivos Presidentes AMADO TORRES BÁEZ, RAMÓN MEJÍAS y JUAN VIDAL ÁLVAREZ y su Sub-Local 1674 y su Presidente LORENZO ROSALY, demandadas.

Núm. 36.—*Sometido:* Junio 9, 1952. *Resuelto:* Julio 23, 1952.

---

618

*Hon. Procurador General Víctor Gutiérrez Franqui, Aurelio Torres Braschi, Procurador General Auxiliar, Hiram R. Cancio Vilella y Ramón Acevedo Oliveras, abogados éstos de*

la Junta y todos de la peticionaria; *Hipólito Marcano* y *Juan Marcano,* abogados de las demandadas; *José López Baralt,* abogado de Central Roig Refining Co. y *Charles R. Hartzell, Rafael O. Fernández* y *José L. Novas,* abogados de la P. R. Steamship Association, como *amici curiae.*

EL JUEZ ASOCIADO SEÑOR NEGRÓN FERNÁNDEZ emitió la opinión del tribunal.

Este caso hace pensar más allá de los límites de su propia controversia: en las virtudes magníficas de la democracia, que la han hecho grande, y en las debilidades y la intolerancia de quienes la disfrutan, que pueden ponerla en peligro.

En los inevitables desacuerdos que a lo largo de sus relaciones surgen entre el capital y el trabajo, uno y otro a veces parecen olvidar, en el ejercicio de sus respectivos derechos— los cuales existen mientras se preserven el acervo democrático y la integridad del Estado que los reconoce—el deber moral y patriótico de dar pronta solución a sus controversias, para evitar que se afecten la economía y la seguridad del sistema que da vida a esos derechos y que fuerzas de adentro o de afuera puedan tomar ventajas de la función de la democracia para socavar sus cimientos y tratar de que se derrote a sí misma.

Este caso proyecta—en la aridez sin vida de un recurso judicial—un ejemplo más del esfuerzo legítimo de un pueblo que lucha contra la escacez y la pobreza, producidas por el desbalance entre su continuo crecimiento poblacional y sus pocos recursos, en su afán desesperado por mejorar sus condiciones de salud y su nivel de vida mediante el desarrollo máximo de sus limitadas potencialidades económicas, para lo cual es factor indispensable la paz industrial en todas las fases de las actividades de producción, con su mayor expresión de estabilidad—por su condición de Isla—en los frentes marítimos.

Dirigiendo su esfuerzo dinámico a lograr realidades vitales para nuestro pueblo en el campo de la paz industrial,

según lo ha hecho en otros campos, la Asamblea Legislativa de Puerto Rico, vigente entonces la Ley Nacional de Relaciones del Trabajo—Ley Wagner—49 Stat. 449, 29 U.S.C.A. secciones 151 *et seq.*, aprobó el 8 de mayo de 1945 la Ley núm. 130—Ley de Relaciones del Trabajo de Puerto Rico— que enmendó luego por la núm. 6 de 7 de marzo de 1946 ((1) pág. 19). Al fijar, en la declaración de principios de dicha ley, la política pública del Gobierno de Puerto Rico en lo concerniente a las relaciones entre patronos y empleados y a la celebración de convenios colectivos, se expresó así:

"(1) Es necesidad fundamental del pueblo de Puerto Rico alcanzar el máximo desarrollo de su producción a fin de establecer los niveles más altos de vida posibles para su población en continuo crecimiento; es la obligación del Gobierno de Puerto Rico adoptar aquellas medidas que conduzcan al desarrollo máximo de esa producción y que eliminen la amenaza de que pueda sobrevenir el día en que por el crecimiento continuo de la población y la imposibilidad de mantener un aumento equivalente en la producción tenga el pueblo que confrontar una catástrofe irremediable; y es el propósito del gobierno desarrollar y mantener tal producción mediante la comprensión y educación de todos los elementos que integran el pueblo respecto a la necesidad fundamental de elevar la producción hasta su máximo, de distribuir esa producción tan equitativamente como sea posible; y es asimismo el propósito del gobierno desarrollar en la práctica el principio de la negociación colectiva, en tal forma que pueda resolverse el problema básico de la necesidad de una producción máxima.

"(2) Paz industrial, salarios adecuados y seguros para los empleados, así como la producción ininterrumpida de artículos y servicios, a través de la negociación colectiva, son factores esenciales para el desarrollo económico de Puerto Rico. El logro de estos propósitos depende en grado sumo de que las relaciones entre patronos y empleados sean justas, amistosas y mutuamente satisfactorias y que se disponga de los medios adecuados para resolver pacíficamente las controversias obreropatronales.

"(3) A través de la negociación colectiva deberán fijarse los términos y condiciones de empleo. A los fines de tal nego-

ciación, patronos y empleados tendrán el derecho de asociarse en organizaciones por ellos mismos escogidas.

"(4) Es la política del Gobierno eliminar las causas de ciertas disputas, fomentando las prácticas y procedimientos de la negociación colectiva y estableciendo un tribunal adecuado, eficaz e imparcial que implante esa política.

"(5) Todos los convenios colectivos vigentes, y los que se hagan en el futuro, por la presente se declaran instrumentos para promover la política pública del Gobierno de Puerto Rico en su esfuerzo de fomentar la producción hasta el máximo; y se declara que como tales están revestidos de un interés público. El ejercicio de los derechos y el cumplimiento de las obligaciones de las partes en dichos convenios colectivos quedan, por tanto, sujetos a aquella razonable reglamentación que sea necesaria para lograr las normas públicas de esta Ley."

Por las secciones 8(1) (*f*), en lo concerniente a patronos, y 8(2) (*a*), en lo concerniente a organizaciones obreras, declaró práctica ilícita de trabajo el que un patrono o una organización obrera, actuando individual o concertadamente, "Viole los términos de un convenio colectivo, incluyendo un acuerdo en el que se comprometa a aceptar un laudo de arbitraje, esté o no dicho acuerdo incluído en los términos de un convenio colectivo; ..."

Es por haber incurrido en la práctica ilícita de violación de convenio—sección 8(2) (*a*) de la ley—al violar la cláusula de no huelga contenida en un convenio colectivo al que nos habremos de referir dentro de poco, que la Junta de Relaciones del Trabajo de Puerto Rico, a la que en adelante nos referiremos como Junta Insular, dictó el 14 de abril de 1952, luego de los trámites de rigor, una Orden dirigida a las aquí demandadas para que "cesen y desistan de en manera alguna violar los términos del convenio que tienen firmado, o que firmen" con la Puerto Rico Steamship Association y las compañías navieras, por ésta representadas, "o con cualquier otra asociación o patrono", y a tomar cierta acción afirmativa. Esa es la Orden que ahora la Junta Insular de conformidad con lo establecido en el artículo 9(2) (*a*) de la ley, nos pide que pongamos en vigor.

Una breve exposición de hechos es necesaria para la cabal comprensión del problema con que nos confrontamos.

El 24 de octubre de 1950 las Uniones Locales afiliadas a la International Longshoremen Association y a la Federación Libre de los Trabajadores de Puerto Rico, representadas por la International Longshoremen Association, District Council of the Ports of Porto Rico, suscribieron un convenio colectivo (1) —retroactivo al primero de enero de 1950 y por el término de dos años— con la Puerto Rico Steamship Association, en representación ésta de las compañías navieras de Puerto Rico, estableciendo los términos y condiciones de trabajo en los distintos puertos de la Isla, los turnos de trabajo y los salarios a ser pagados a los obreros y empleados en las distintas clases de faenas relacionadas con la carga y descarga abordo de los barcos y en tierra, y con la entrega de carga almacenada en los muelles. (2)

La cláusula de vigencia de dicho convenio dispuso lo siguiente:

"Las partes acuerdan que este convenio colectivo tendrá efecto retroactivo al día 1º de enero de 1950 y continuará en vigor durante un período de dos (2) años a partir de dicha fecha, o sea, hasta el día 31 de diciembre de 1951. Disponiéndose,

(1) Para el 24 de octubre de 1950 la International Longshoremen Association estaba constituída por dos ramas: una, "Consejo de Distrito de Puerto Rico", y otra "Consejo de Distrito No. 2". Cada rama firmó un convenio colectivo individual con aquellas compañías navieras miembros de la Puerto Rico Steamship Association que empleaban trabajadores afiliados a cada rama. El 12 de noviembre de 1950 ambos Consejos se fusionaron y desde entonces quedaron integrados en una sola organización denominada International Longshoremen Association, District Council of the Ports of Porto Rico, afiliada a la International Longshoremen Association y a la Federación Libre de los Trabajadores de Puerto Rico. Por estipulación firmada el 12 de marzo de 1951 la Puerto Rico Steamship Association en representación de las compañías navieras reconoció a la nueva entidad como única unidad contratante. Por eso hemos de hacer referencia, en el curso de la opinión, a un solo convenio colectivo.

(2) Los "dependientes" empleados por algunas de las compañías navieras para la entrega de carga almacenada en los puertos de San Juan no están cubiertos por dicho convenio, por integrar otra organización obrera conocida como UDEM (Unión de Empleados de Muelles), que es la unidad contratante para tales faenas en dichos casos.

sin embargo, que cualquiera de las partes, no menos de sesenta (60) días antes del día 31 de diciembre de 1950 podrá notificar a la otra por escrito, su deseo de enmendar exclusivamente las escalas de salarios fijadas en este convenio por el Artículo III.

"Disponiéndose, además, que en caso de alguna enmienda a las Leyes, estableciendo una jornada de trabajo de menos de ocho (8) horas diarias o cuarenta (40) horas semanales, las partes se reunirán para negociar las cláusulas de horas de trabajo y escalas de salarios que puedan quedar afectadas por la enmienda."

Y la de no huelga, artículo 7, inciso 27, lo siguiente:

"27. Todos y cada uno de los miembros de la Unión incluídos en la unidad contratante, se comprometen a no suspender el trabajo ni parcial ni totalmente, por ninguna razón o motivo durante la vigencia de este contrato, y en el caso de cualquier incidente, disputa o controversia que surja en relación con la interpretación de cualquier cláusula o disposición de este convenio, los trabajadores continuarán los trabajos y dicho incidente, disputa o controversia deberá inmediatamente ser discutido por el representante autorizado o delegado de la Unión directamente con el Gerente o representante autorizado de las Compañías y no con los capataces o de no llegarse a un acuerdo, el asunto en discusión será sometido al Comité de Arbitraje establecido en el Artículo IX de este Convenio."

El 30 de octubre de 1950 la Unión contratante dirigió una carta a la Asociación representante de las compañías navieras "expresando su deseo de reabrir la cláusula de salarios de acuerdo con el convenio." La Asociación contestó a la Unión que "habiéndose firmado el convenio tan recientemente, no había existido cambio alguno para que justificara enmienda a la escala de salarios pero que las compañías estaban en la mejor disposición y en condiciones de sentarse a negociar en cualquier momento que la Unión lo decidiera." [3]

Entre el 22 de octubre y 6 de diciembre de 1951 tuvieron lugar ciertos hechos que se sintetizan así: [4]

[3] Del testimonio del Sr. Ramón Rodríguez Sánchez ante la Junta Insular, pág. 71.

[4] Del Informe del Oficial Examinador, adoptado por la Junta, págs. 15, 16 y 17.

"1. Para el 24 de octubre de 1951 existía y estaba en vigor un convenio colectivo entre la Asociación y la ILA.

"2. Ese convenio contenía una cláusula en la cual la ILA se comprometía a no ir a la huelga por ninguna razón o motivo durante la vigencia del convenio.

"3. El 24 de octubre de 1951 miembros del Gremio de Prensa y Radio montaron piquetes frente a los muelles de San Juan.

"4. Los trabajadores miembros de la ILA, dedicados a la carga y descarga de los barcos en el muelle se negaron a cruzar esos piquetes.

"5. Las Compañías hicieron todas las gestiones necesarias para que los trabajadores se reintegraran a sus trabajos.

"6. Oficiales de la ILA condicionaron el regreso a las labores a que no se manejara mercancía perteneciente a los auspiciadores de programas radiales de la Estación W.K.A.Q. y a que los barcos se movieran a muelles donde no se empleara personal perteneciente a la matrícula de la U.D.E.M.

"7. El 29 de octubre de 1951 y autorizado por el Presidente de la ILA, Sr. Eusebio G. Moreno, se reanudaron las labores de carga y descarga en el frente portuario.

"8. El convenio colectivo contenía una cláusula que permitía la reapertura de las negociaciones de los salarios.

"9. Contenía además una cláusula que obligaba a la ILA a notificar a las Compañías con 48 horas de anticipación la celebración de una asamblea.

"10. El 24 de octubre de 1951 las partes contratantes se reunieron para discutir la cuestión de salarios.

"11. Surgió un impase debido a que las Compañías deseaban que la ILA les ofreciera garantía de cumplir el convenio en vigor.

"12. La ILA notificó a las Compañías que en 29 de noviembre, 30 de noviembre y 3 de diciembre de 1951 los trabajadores celebrarían asambleas en Mayagüez, Ponce y San Juan, respectivamente.

"13. En Ponce y San Juan los trabajadores se constituyeron en asamblea permanente hasta tanto no se decidiera la cuestión de salarios.

"14. Miembros de la ILA de Ponce trabajaron en la carga y descarga de dos barcos, uno en Guayanilla y otro en Ponce durante el 30 de noviembre y el 6 de diciembre de 1951.

"15. El 5 de diciembre de 1951 las partes firmaron una Estipulación comprometiéndose las Compañías a garantizar un

aumento de 3¢ por hora y a que se reanudarían las negociaciones a la mayor brevedad posible y la ILA a regresar al trabajo.

"16. Así en 6 de diciembre de 1951 a las 7:00 A.M. en San Juan y a las 2:00 P.M. en Ponce se reanudaron los trabajos de carga y descarga de los barcos."

El 29 de octubre de 1951 la Asociación radicó ante la Junta Insular un Cargo contra la International Longshoremen Association, District Council of the Ports of Porto Rico y su Presidente Eusebio G. Moreno, imputándole prácticas ilícitas de trabajo bajo el artículo 8, sección 2 inciso (a) de la Ley de Relaciones del Trabajo de Puerto Rico, consistente en que para el 22 de octubre de 1951 y hasta la fechà de radicación de dicho Cargo "ha venido violando los Incisos 27 y 28 del artículo 7 del convenio colectivo en vigor entre dicha organización obrera y las compañías navieras miembros de la Puerto Rico Steamship Association al declarar un estado de huelga ilegal, motivando dicha huelga la paralización de las operaciones de carga, descarga y entrega de mercancía de los vapores pertenecientes a/o consignados a las compañías navieras miembros de la Puerto Rico Steamship Association."

El 14 de diciembre de 1951 se radicó un segundo Cargo enmendado contra la misma International Longshoremen Association (ILA), District Council of the Ports of Porto Rico y su Presidente Eusebio G. Moreno así como contra sus Uniones afiliadas imputándole prácticas ilícitas de trabajo bajo el propio artículo, sección e inciso de la ley arriba mencionados, consistente en que "en o allá para el 30 de noviembre de 1951 y hasta la fecha" violaron el inciso 27 del artículo VII del convenio colectivo en vigor "al declarar un estado de huelga ilegal en los puertos de Ponce, Puerto Rico, motivando dicha huelga la paralización de carga, descarga y entrega de las mercancías de los vapores pertenecientes o consignados a las Compañías Navieras querellantes." Se imputó también por dicho cargo igual práctica ilícita, desde el

3 de diciembre de 1951, "al declarar un estado ilegal de huelga en los puertos de San Juan", con iguales consecuencias.

En virtud de los referidos cargos, que fueron consolidados a todos los fines, la Junta Insular formuló querella contra la ILA según se ha nombrado anteriormente, y su Presidente Moreno, y sus afiliadas: Unión Local Núm. 1782 y su Presidente Ramón Mejías; Unión Local Núm. 1740 y su Presidente Amado Torres Báez; Unión Local Núm. 1764 (Unión de Dependientes) y su Presidente Juan Vidal Álvarez y su Sub-Local Unión de Dependientes Núm. 1674 y su Presidente Lorenzo Rosaly, imputándoles, como práctica ilícita de trabajo bajo el artículo 9 (2) (a), la violación del convenio colectivo en su cláusula de no huelga.

Designado un Oficial Examinador, se señaló fecha para la audiencia dispuesta por el artículo 9 (1) (a) de la ley, notificándose debidamente a todas las partes envueltas. A dicha audiencia concurrieron tanto la Junta Insular por su abogado como las compañías por los suyos, mas no así las demandadas, quienes tampoco radicaron comparecencia escrita alguna. Practicada la prueba para sostener la querella, el Oficial Examinador rindió su informe a la Junta Insular (5) el 13 de febrero de 1952 y ésta, el 14 de abril, dictó decisión adoptando sus conclusiones y recomendaciones, expidiendo contra las demandadas la Orden que ahora nos pide pongamos en vigor.

En su contestación a la petición las demandadas impugnan la jurisdicción de la Junta Insular para entender en el procedimiento que dió por resultado la mencionada Orden, sosteniendo que dicha jurisdicción reside exclusivamente en la Junta Nacional de Relaciones del Trabajo toda vez que "los actos supuestamente realizados por las demandadas cons-

---

(5) La primera comparecencia de las demandadas ante la Junta Insular, según aparece del récord ante nos, fué hecha el 21 de febrero de 1952, ocho días después de rendido el informe del Oficial Examinador, a los fines de solicitar prórroga para radicar excepciones al informe de dicho Oficial Examinador. Del récord no aparece que las mismas fueran radicadas.

tituyen prácticas ilícitas de trabajo o negativas a negociar por parte de las uniones demandadas, todo lo cual está específicamente estatuído en la Ley Taft-Hartley", y que la Junta Nacional estaba interviniendo "en los hechos que motivaron el presente procedimiento en la Junta de Relaciones del Trabajo de Puerto Rico." También sostienen que el remedio de las querellantes no era acudir a la Junta Insular, sino entablar acción de daños y perjuicios a tenor con la sección 301 de la Ley Taft-Hartley, ya que la Junta Insular "no puede calificar de práctica ilícita de trabajo [violación de convenio] un acto específicamente excluído como tal" por la Ley Federal, en virtud de haberlo sustituído por dicho remedio; que no hubo violación del convenio al declararse en asambleas permanentes, ya que tales asambleas fueron convocadas estrictamente de acuerdo con el inciso 29 del artículo 27 del mismo; (⁶) que de sostenerse la Orden de la Junta Insular se estaría exponiendo a las querelladas dos veces por los mismos hechos, en dos jurisdicciones distintas, la Insular y la Federal; y que, en todo caso, dicho convenio expiró el 31 de diciembre de 1951, habiéndose firmado uno nuevo el 13 de marzo de 1952, que está en vigor. En su argumentación oral el día de la vista el abogado de las querelladas sostuvo que el convenio colectivo contenía una cláusula sobre taller cerrado (*closed shop*) en violación de la Ley Federal, y que por ello la Junta Nacional había expedido querella contra la Unión y las Compañías; que una Orden de la Junta Nacional tendría el efecto de anular no sólo la cláusula ilegal sino todo el convenio, por lo cual no podía la Junta Insular, ni este Tribunal, poner en vigor una Orden de cesar y desistir de violar un convenio que nunca existió.

Pasemos a considerar las cuestiones planteadas.

---

(⁶) Dicho inciso dispone:

"29. Cuando la Unión vaya a celebrar una asamblea, lo notificará a las Compañías con no menos de 48 horas de anticipación.

"Si por la conveniencia del trabajo fuera menester posponer de mutuo acuerdo la celebración de una asamblea, la Unión prorrogará el plazo 48 horas más, sin que venga obligada a conceder ulteriores aplazamientos."

## La cuestión de Jurisdicción.

El objetivo de la Ley Nacional de Relaciones del Trabajo, enmendada por la Ley Nacional de Relaciones Obrero-Patronales, 1947 (Ley Taft-Hartley), 61 Stat. 136, 29 U.S.C.A. sec. 141, es el de promover la paz industrial, alentando la adopción de convenios voluntarios, mediante la negociación colectiva, que rijan las relaciones entre las uniones y los patronos. *N.L.R.B.* v. *American National Insurance Co.*, 343 U. S. 395, —— L. ed.—— (1952); *Consolidated Edison Co.* v. *National L. R. Bd.* (1938), 305 U.S. 197, 83 L. ed. 126. Dicha ley no obliga a las uniones ni a los patronos a aceptar las proposiciones de la otra parte, ni requiere de ninguna de ellas que haga concesiones. Sección 8(*d*). Tampoco reglamenta los términos sustantivos de horas, salarios y condiciones de trabajo que se incorporan a un convenio. La teoría de la ley es que la adopción de convenios voluntarios de trabajo se estimula mediante la protección del derecho de los empleados a organizarse para la contratación colectiva y la imposición a empleados y patronos de la mutua obligación de negociar colectivamente. Por eso es crucial para el propósito de la ley exigir el cumplimiento de la obligación de contratar colectivamente. *N.L.R.B.* v. *American National Insurance Co.*, supra.

El interés nacional expresado a través de la Ley Nacional de Relaciones del Trabajo no está centralizado primordialmente en las condiciones de trabajo como tales. En lo que a la ley en sí concierne, dichas condiciones pueden ser "tan malas para los empleados como ellos toleren, o tan buenas como ellos puedan negociar." *Terminal R. Asso.* v. *Brotherhood of R. Trainmen* (1943), 318 U.S. 1, 87 L. ed. 571.

El Congreso, en la consecución de su objetivo de promover la paz industrial, equiparó a uniones y patronos situándolos a un mismo nivel para los fines de la contratación colectiva. Y sin menoscabar el derecho fundamental a la huelga, reglamentó—hasta donde consideró apropiado para mantener el

balance de poder entre el capital y el trabajo en el objetivo perseguido—tanto la conducta de las uniones como la de los patronos, declarando prácticas ilícitas de trabajo determinadas actividades de unas y otros. Para reprimir e impedir las prácticas ilícitas especificadas en la sección 8 de la ley, confirió poder a la Junta Nacional de Relaciones del Trabajo, el cual poder "no será afectado por algún otro medio de resolución o prevención que se haya establecido o pueda establecerse mediante convenio, ley, o en alguna otra forma." Sección 10 (d) (⁷). En el ejercicio de tal poder la jurisdicción de la Junta Nacional es exclusiva. *Asoc. Empl. Bayamón Transit* v. *Junta Rel. Trabajo*, 70 D.P.R. 292 y casos y autoridades en él citados. En dicho caso, al estudiar el alcance de la sección 10 (a) de la Ley Taft-Hartley, dijimos: "Esta disposición se ha interpretado casi uniformemente como que significa que donde un patrono está sujeto a la ley Taft-Hartley, la jurisdicción de la Junta Nacional en cuanto a prácticas ilícitas de trabajo cubiertas por la Ley Federal es exclusiva, y que una Junta estatal o territorial puede obtener jurisdicción sobre las mismas *solamente si la Junta Nacional cede jurisdicción a tenor con la sección 10(a)* [Citas]." Véanse, en adición a las autoridades en dicho caso citadas, las siguientes: Feldblum, *Jurisdictional "Tidelands" in Labor Relations* (febrero, 1952), 3 Labor Law Journal 114; Fork-

---

(⁷) El texto completo de dicha sección 10 (a) es el siguiente:

"Se confiere poder a la Junta, según más adelante se dispone, para impedir que cualquier persona se dedique a cualquier práctica ilícita del trabajo (enumeradas en la sección 8) que afecte al comercio. Este poder no será afectado por algún otro medio de resolución o prevención que se haya establecido o pueda establecerse mediante convenio, ley, o en alguna otra forma; *Disponiéndose,* que la Junta tendrá poder mediante convenio con cualquier agencia de cualquier Estado o Territorio para cederle a dicha agencia jurisdicción sobre cualesquiera casos en cualquier industria (fuera de minas, manufactura, comunicaciones y transportación excepto cuando su carácter sea predominantemente local) aun cuando tales casos puedan envolver disputas obreras que afecten el comercio, a menos que la disposición del estatuto del Estado o Territorio aplicable a la determinación de tales casos por tal agencia sea inconsistente con la disposición correspondiente de este subtítulo o haya recibido una interpretación inconsistente con él."

osch, *N.L.R.B's New Jurisdictional Rule on Secondary Boycotts* (abril, 1951), 2 Labor Law Journal 247; Garfinkel, *The Conflict between Federal and State Jurisdiction* (oct., 1950), 1 Labor Law Journal 1027; Petro, *State Labor Law*, 1950 Annual survey of American Law 367; Benetar, *Jurisdictional Conflict in Labor Law: State Boards* versus *The National Board* (enero, 1950), 36 American Bar Association Journal 27; Schwartz, *No Mansland in Labor Relations* (diciembre, 1949), 1 Labor Law Journal 189; Feinsinger, *Federal-State Relations Under the Taft-Hartley Act*, 1948 Proceedings, New York University First Annual Conference on Labor, 463.

Resolviendo la cuestión de jurisdicción, que no envolvía una violación de convenio bajo la Ley Insular, dijimos en el caso de la *Bayamón Transit* que la Junta Insular "tiene jurisdicción solamente cuando (1) el patrono comete una práctica ilícita de trabajo o lleva a cabo alguna otra conducta que no está enumerada en la Ley Federal pero incluída en la ley local", "(2) el negocio del patrono está exento bajo la Ley Federal o sujeto a la Ley Insular, v.g., corporaciones gubernativas y aquellos que se dedican a la agricultura", y "(3) la Junta Nacional cede jurisdicción a la Junta Insular de conformidad con las condiciones fijadas en la sección 10(a) de la Ley Taft-Hartley." Como en el presente caso no se trata de los números (2) y (3), la cuestión de jurisdicción primordialmente gira alrededor del hecho de si siendo la huelga de octubre de 1951 una práctica ilícita de trabajo bajo la Ley Taft-Hartley—y a la vez una violación del convenio en su cláusula de no huelga—tiene jurisdicción la Junta Insular bajo la ley local, que establece como práctica ilícita de trabajo la violación de un convenio colectivo.

Como la exclusividad de la jurisdicción de la Junta Nacional está, por los propios términos de la sección 10(a), limitada a la esfera de las prácticas ilícitas de trabajo consignadas en la sección 8, el conflicto jurisdiccional que pueda originarse con motivo de leyes o actuaciones de organismos

estatales o territoriales en el campo de las relaciones obrero-patronales, depende del área que el Congreso haya reglamentado en el ejercicio de su poder bajo la Cláusula de Comercio—y la de Territorios, en su. caso—ya que la Ley Federal "ha cerrado a la reglamentación estatal el campo de las huelgas pacíficas en industrias que afectan el comercio." *Amalgamated Asso.* v. *Wisconsin Emp. Rel. Bd.*, 340 U.S. 383, 394, 95 L. ed. 364, 375; *International Union* v. *O'Brien*, 339 U.S. 454, 94 L. ed. 978.

Una breve referencia a las decisiones del Tribunal Supremo Nacional, en las que ha estado envuelta la importante y aún controversial cuestión relativa a la jurisdicción de las Juntas Estatales en materia de relaciones obrero-patronales, es necesaria para la mejor comprensión del problema que nos ocupa.

Hasta la fecha, nueve son los casos resueltos por dicho tribunal en que se ha considerado la cuestión. En tres de ellos se ha sostenido la actuación o reglamentación estatal. En seis se ha revocado. En *Allen-Bradley Local* v. *Board* (1942), 315 U.S. 740, 86 L. ed. 1154, se sostuvo la jurisdicción de la Junta de Relaciones del Trabajo de Wisconsin al sostenerse una orden dirigida a la unión a la que encontró culpable de práctica ilícita de trabajo bajo la ley estatal. Las actividades de la unión que dieron margen a dicha orden fueron, en síntesis, que los empleados se dedicaron a establecer piquetes en masa en las entradas de las factorías del patrono, obstruyendo e interviniendo con la entrada y salida de la misma; que amenazaron con hacer daño corporal a otros empleados que deseaban continuar en sus labores; que la unión, por sus oficiales y varios de sus empleados, hicieron daño corporal a, y a la propiedad de, los otros empleados y que un número de los miembros de la unión apelante llevaron a cabo actos de intimidación contra los otros, impidiendo que realizaran sus labores por medio de amenazas y coacción y de daño personal y a su propiedad.

Al confirmar la decisión de la Corte Suprema de Wisconsin el Tribunal Supremo sostuvo que la Ley Federal—Ley Wagner—no impedía a los Estados aprobar legislación limitada a prohibir o reglamentar tal clase de actividad unional o de los empleados, por cuanto la conducta de éstos en dicho caso no caía dentro del concepto de *actividad concertada protegida* por la Ley Federal, pudiendo ser reglamentada por el Estado; que el derecho de éstos a reglamentar materia tradicionalmente local, como el orden y la seguridad pública, no había sido menoscabado, ya que la intención del Congreso de impedir a los Estados del ejercicio de su poder de policía debe ser claramente manifestada, y que tal intención no se manifestaba cuando la ley estatal y la federal eran consistentes y podían ambas ser reconciliadas.

En *International Union* v. *Wisconsin Empl. Rel. Bd.* (1949), 336 U.S. 245, 93 L. ed. 651, la práctica de la unión fué instigar paros intermitentes y sin aviso previo en el trabajo para ejercer presión económica en el patrono, habiéndose extendido los mismos durante un período de más de cuatro meses. Al sostener a la Corte Suprema de Wisconsin que en definitiva sostuvo a la Junta Estatal en su orden dirigida a la unión para que cesara y desistiera de esa conducta, el Tribunal Supremo, dividido 5 a 4, resolvió que la conducta de la unión no estaba prohibida por la Ley Taft-Hartley y que ningún procedimiento se autorizaba mediante el cual la Junta Nacional pudiera intervenir con ella en forma alguna; que ésta, si bien tenía poder "para prohibir una huelga cuando y porque su propósito es uno que la Ley Federal hace ilegal, no se le ha dado poder para prohibirla porque su método sea ilegal—aun si su ilegalidad consistiera de violencia o amenaza de violencia a personas, o de destrucción de propiedad. La reglamentación de tal conducta ha sido dejada enteramente en manos de los Estados" en el ejercicio de su poder de policía. "Esta conducta", dijo el Tribunal, "es controlable por el Estado o está enteramente no controlada."

En *Algoma Plywood Co.* v. *Wis. Board* (1949), 336 U.S. 301, 93 L. ed. 691, se sostuvo igualmente a la Corte Suprema de Wisconsin y a la Junta Estatal en su orden dirigida al patrono de cesar y desistir de dar efecto a una cláusula de un convenio, sobre mantenimiento de matrícula; que repusiera a un empleado que había sido despedido por negarse a pagar las cuotas de la unión, y que le pagara los salarios dejados de percibir desde su despido. La posición tanto del patrono como de la unión fué que la Junta Estatal carecía de jurisdicción y que ésta residía en la Junta Nacional de Relaciones del Trabajo; que la Ley Estatal confligía con la Federal, ya que la primera declaraba práctica ilícita de trabajo la inclusión en un convenio de la cláusula de mantenimiento de matrícula a menos que fuere aprobada por el voto de ⅔ partes de los empleados, mientras que la segunda permitía tales cláusulas si eran aprobadas solamente por una mayoría. El Tribunal Supremo sostuvo que la Ley Federal no impedía el ejercicio de poder por el Estado para establecer normas más estrictas sobre la materia de cláusulas de seguridad unional.

Estableciendo el alcance de la sección 10 (*a*) de la Ley Taft-Hartley en lo relativo a la cesión de jurisdicción por parte de la Junta Nacional a las Estatales, dijo el Tribunal Supremo que esta cesión de jurisdicción puede únicamente ocurrir cuando las disposiciones entre las Leyes Estatal y Federal son paralelas; que si la Ley Federal no se sobrepone a la Estatal es innecesaria la cesión por cuanto la jurisdicción del Estado no ha quedado afectada.

Por otro lado, en los seis casos restantes se invalidó la actuación o la legislación estatal. En *Hill* v. *Florida* (1945), 325 U.S. 538, 89 L. ed. 1782, se anuló una ley estatal que requería una licencia a los agentes de las uniones obreras, se establecían sus cualificaciones y se dejaba a discreción de ciertos funcionarios estatales la determinación de si los solicitantes reunían las debidas calificaciones para ello. El fundamento para tal decisión fué el de que el estatuto coartaba la libertad absoluta que confería a los empleados la

Ley Nacional de Relaciones del Trabajo para seleccionar su propia unidad contratante, ya que tal derecho les estaba reconocido en forma ilimitada por la sección 7 de dicha ley, y que estando protegidos por ésta, no podía el Estado imponer una limitación al mismo aun cuando no hubiera inconsistencia entre la Ley Estatal y la Federal.

En *Bethlehem Steel Co.* v. *New York Labor Rel. Bd.* (1947), 330 U.S. 767, 91 L. ed. 1234, la Junta Nacional se negó a certificar una unión de inspectores como unidad contratante con el patrono. La Junta de Relaciones del Trabajo de Nueva York entonces certificó dicha unión. Al llegar el caso en última instancia al Tribunal Supremo Nacional éste resolvió que la negativa de la Junta Nacional a certificar las uniones de inspectores para los fines de contratación colectiva bajo la Ley Nacional de Relaciones del Trabajo no dejaba en libertad a la Junta Estatal para actuar; que cuando la Ley Nacional de Relaciones del Trabajo "deja la relación obrero-patronal libre de reglamentación en algunos aspectos, se implica que en tales materias la política federal es indiferente, y toda vez que es indiferente a lo que el individuo por su propia voluntad puede hacer, sólo podemos suponer que es igualmente indiferente a lo que él puede hacer bajo la compulsión del estado"; y que la Ley Federal y la Estatal sobre representación de uniones como unidades contratantes se aplicaban a la misma relación y envolvían las mismas personas, pero se regían por normas distintas; que si se permitía la aplicación de la Ley Estatal, dos agencias estarían ejerciendo control sobre la misma materia y que cuando tal conflicto administrativo era probable, era suprema la Ley Federal.

En *La Crosse Tel. Corp.* v. *Wis. Board* (1949), 336 U.S. 18, 93 L. ed. 463, la Junta Estatal ordenó que se celebraran unas elecciones a instancias de una unión rival de aquélla con la cual el patrono tenía un convenio colectivo que continuaría de año en año a menos que fuera terminado mediante aviso previo. Como consecuencia de esa elección, certificó

a la unión rival como unidad contratante. Tanto el patrono como la unión adversamente afectada impugnaron la jurisdicción de la Junta Estatal. El Tribunal Supremo Nacional en última instancia resolvió que la Junta Estatal no podía ejercer jurisdicción para determinar el representante o unidad apropiada de contratación colectiva de los empleados de un patrono dedicado a comercio interestatal, aun cuando la Junta Nacional no hubiera asumido jurisdicción sobre el caso, si no había ejercitado la Junta Nacional su poder estatutario de ceder su jurisdicción a la agencia estatal.

En *Plankinton Packing Co.* v. *Wisconsin Employment Rel. Board* (1950), 338 U.S. 953, 94 L. ed. 588, basándose en los casos de *Bethlehem* y *La Crosse*, el Tribunal Supremo revocó en opinión *per curiam* una decisión de la Corte Suprema de Wisconsin, por la cual dicha Corte Suprema sostuvo que la conducta de una unión, cuyos miembros coaccionaban o intimidaban a un empleado que había renunciado como miembro de la misma para que perdiera el trabajo y de ejercer coacción e intimidación e inducir al patrono a que le dejara cesante por haber éste renunciado como miembro de la unión —lo cual hizo el patrono—constituía práctica ilícita de trabajo tanto de la unión como del patrono, bajo las leyes de Wisconsin.

En *International Union* v. *O'Brien* (1950), supra, los empleados se declararon en huelga en demanda de mayores salarios, sin seguir las disposiciones de la Ley del Estado de Michigan que requería una votación por mayoría para que la huelga quedara autorizada, luego de haber fracasado las gestiones de mediación. El Tribunal Supremo Nacional resolvió que el campo de reglamentación de las huelgas pacíficas por mayores salarios estaba ocupado y cerrado a reglamentación estatal concurrente por la Ley Nacional de Relaciones del Trabajo, según enmendada por la Ley Taft-Hartley, que en su sección 8(*d*) reglamenta la materia sin que requiera autorización mayoritaria para la huelga. El tribunal dijo que la disposición de la ley estatal confligía con

el ejercicio de los derechos de los trabajadores protegidos por la Ley Federal y que por lo tanto no podía sobrevivir. En dicho caso se distinguió el de *International Union* v. *Wisconsin Empl. Rel. Bd.*, supra, ratificándose el principio de que si el Congreso ha protegido la conducta unional que el Estado prohibe, la legislación estatal debe ceder.

Y en *Amalgamated Asso.* v. *Wisconsin Empl. Rel. Bd.*, supra, un estatuto de Wisconsin que prohibía huelgas en contra de compañías de servicio público y que disponía el arbitraje compulsorio en disputas obreras después de llegar a un impase las negociaciones, fué declarado nulo por estar en conflicto con la Ley Nacional de Relaciones del Trabajo, según enmendada por la Ley Taft-Hartley. Citando el caso de *O'Brien* y luego de examinar la sección 7 de la Ley Federal y exaltar la salvaguarda que la misma representa para los empleados en cuanto a su derecho a la huelga, así como otras disposiciones de dicha ley que reglamentan y prohiben huelgas para ciertos propósitos, dijo: "De cualquier modo, la imposición por el Congreso de ciertas restricciones en el derecho del peticionario a la huelga, lejos de sostener la ley de Wisconsin, indica que el Congreso ha cerrado a la reglamentación estatal el campo de las huelgas pacíficas en industrias que afectan el comercio. [Se cita el caso de *O'Brien*.] Y cuando, como aquí, el estado trata de negar enteramente un derecho garantizado por la Ley Federal que el propio Congreso restringió solamente en forma limitada en casos de emergencias nacionales, por serias que fueran, es manifiesto que la legislación estatal está en conflicto con la federal."

Del anterior resumen se hace patente que ninguna de las actuaciones de las Juntas Estatales en los citados casos estuvo predicada en una violación de convenio declarada práctica ilícita de trabajo bajo la ley estatal.([8])

([8]) El *Wisconsin Employment Peace Act* declara, por sus secciones 111.06 (1) (*f*) y 111.06 (2) (*c*), la violación de un convenio como práctica cita de trabajo.

La Ley de Relaciones del Trabajo de Minnesota establece por su sección 179.11 que una huelga en violación de un convenio, cuando el patrono

La Ley Federal no declara, en su sección 8, práctica ilícita de trabajo la violación de un convenio colectivo. *Junta Relaciones del Trabajo* v. *N. Y. & P. R. S/S Co.*, 69 D.P.R. 782. Tal campo no está ocupado por dicha ley en forma que excluya reglamentación estatal o territorial en ese sentido, *W.E.R.B.* v. *Bookbinders & Bindery Women's Local No. 49*, 21 Labor Cases 66, 484; *cf. Federalism and Labor Relations* (1950), 64 Harv. L. Rev. 211, en el ejercicio del poder de policía. La declaración de principios de la Ley Local establece la realidad contemporánea en que basó la Asamblea Legislativa su reglamentación en cuanto a la violación de convenios colectivos. Es la amenaza creciente a la seguridad, la vida y la salud de un pueblo que se esfuerza por evitar la catástrofe, lo que movió al poder legislativo a declarar los convenios colectivos instrumentos para promover la política pública del Gobierno de Puerto Rico, y como tales, revestidos de interés público.

A la Junta Nacional no se le confirió por la Ley Federal poder alguno para impedir la violación de un convenio colectivo, ni para impedir una huelga en violación de una cláusula de no huelga en un convenio por el hecho escueto de dicha violación, aun cuando se le haya conferido, independientemente del convenio, para impedirla cuando la conducta en cuestión constituya práctica ilícita de trabajo bajo la sección 8. La razón es que la filosofía del estatuto federal se funda esencialmente en la necesidad de fomentar la negociación colectiva y la adopción de convenios voluntarios. Y aun cuando el deber de negociar colectivamente no termina con la firma de un convenio, *N.L.R.B.* v. *Jacobs Mfg. Co.*, (C.A. 2, 1952), —— F.2d ——, el interés primordial del estatuto se ha cumplido con dicha firma. De ahí en adelante, en cuanto a modificación o terminación del convenio,

---

está cumpliendo con aquél de buena fe, es una práctica ilícita de trabajo, e igualmente lo es la violación de los términos y condiciones de un convenio colectivo; y por la sección 179.12 igual declaración se hace respecto a los patronos y el "lockout", así como también en cuanto a la violación de los términos y condiciones de un convenio colectivo.

sólo se prohibe la huelga por un período limitado. Sección 8(d). Una vez cumplidos los requisitos exigidos, nada hay en la ley que la prohiba. Pero cuando se ha renunciado a ella mediante una cláusula de no huelga, una huelga en violación de tal cláusula es ilegal, pues no cae dentro de las "actividades concertadas" protegidas por la sección 7 de la Ley Federal, *National Labor Rel. Bd.* v. *Sands Mfg. Co.*, 306 U.S. 332, 83 L. ed. 682, ni está protegida por la sección 13 que establece el alcance de la ley en cuanto al derecho a la huelga. "El reconocimiento del 'derecho a la huelga' claramente contempla una huelga legal—el ejercicio del derecho incuestionable de suspender el trabajo, *National Labor Relations Bd.* v. *Fansteel Metalurgical Corp.*, 306 U.S. 240, 83 L. ed. 627—pero no opera para legalizar una huelga en violación de un convenio adoptado de acuerdo con la ley federal." *International Union* v. *Wisconsin Empl. Rel. Bd.*, supra.

No hay duda, por lo dicho en el caso de *O'Brien*, citando los de *Plankinton*, *La Crosse*, *Bethlehem* y el de *Hill* v. *Florida*, supra, y repetido en el de *Amalgamated Asso.* que las secciones 8(d) y 8(b)(4)(⁹)—y las 10(j) y 10(L) de la Ley Taft-Hartley, que dan facultad y ordenan a la Junta Nacional a obtener remedio mediante *injunction* contra las huelgas prohibidas por las mencionadas secciones—no permiten "reglamentación estatal concurrente de huelgas pacíficas por mejores salarios" y que el Congreso "ocupó este campo y lo cerró a la reglamentación estatal".

Pero la cuestión envuelta en este caso no gira alrededor de reglamentación alguna por parte de la Legislatura o la Junta Insular, de una huelga en sí. La Orden de la Junta

---

(⁹) La sección 8(d) es la que prohibe recurrir a la huelga durante un período de 60 días después de haber dado aviso de que se desea modificar o terminar un convenio colectivo, cuando hay uno en vigor, e impone ciertos requisitos a ser cumplidos previamente. La violación de dicha sección constituye una *negativa a negociar*, y como tal, es una práctica ilícita de trabajo. *Curry* v. *Unión de Trabajadores de la Industria del Cemento Ponce* (D.C. P.R., 1949), 86 F. Supp. 707.

La sección 8(b)(4) es la que prohibe recurrir a la huelga para ciertos propósitos, entre ellos, el de producir el llamado "boicot" secundario.

Insular no prohibe una "huelga" que como tal esté protegida por las secciones 7 y 13 de la ley, o que esté prohibida por las secciones 8(d) u 8(b) (4), ya que una huelga en violación de un convenio colectivo ni está protegida por las secciones 7 ó 13 ni prohibida por las 8(d) u 8(b) (4). La Orden prohibe que se viole el convenio colectivo que aceptó la Unión, el cual contiene una cláusula de no huelga, que fué violada por la Unión. A lo sumo, podría decirse que la Orden de la Junta Insular prohibe una huelga que no estando protegida ni prohibida por la Ley Taft-Hartley, está prohibida por la propia determinación y voluntad de la Unión, al obligarse a no recurrir a la huelga durante la vigencia del convenio, lo cual es una práctica ilícita de trabajo bajo la Ley Insular.

Una huelga en violación de una cláusula de no huelga en un convenio colectivo es una violación material del convenio, pero no un abandono ni una total repudiación de éste, que ofrece al patrono la oportunidad de terminar el mismo a su elección. *Boeing Airplane Co.* v. *Aeronautical Industrial Lodge, etc.* (C.A. 9, 1951), 188 F.2d 356.

El término "práctica ilícita de trabajo" no es uno que tenga significación propia, independiente de su definición estatutaria. Los estados están en libertad (excepto cuando el Congreso ha ocupado el campo) de caracterizar cualquier daño de un patrono a un empleado [o de un empleado a un patrono] ya sea creado estatutariamente o ya existiera bajo la ley común, como una práctica ilícita de trabajo. *Algoma Plywood Co.* v. *Wis. Board*, supra. Al igual que en dicho caso, aceptar aquí el argumento de las querelladas de falta de jurisdicción de la Junta Insular sería deshechar la frase "(enumeradas en la sección 8)" contenida en la sección 10(a) de la Ley Taft-Hartley, y agregar la frase "y ninguna otra agencia tendrá poder para impedir una práctica ilícita de trabajo no enumerada en la sección 8."

La violación de una cláusula de no huelga en un convenio colectivo es una práctica ilícita de trabajo bajo la

Ley Local, sobre la cual puede actuar y conceder un remedio la Junta Insular, sin que obste para ello que el medio para llevar a cabo`la infracción del convenio constituya una práctica ilícita bajo la Ley Federal. *Art Steel Co., Inc.* v. *Velázquez*, (1952), 109 N.Y.S. 2d 788, 21 Labor Cases 66,728, conf. por otros fundamentos en 111 N.Y.S. 2d 198 (1952), 21 Labor Cases 66,842. Cuando el campo no está reglamentado, como no lo está el de violación de convenios bajo la Ley Federal, no existe cuestión alguna de jurisdicción de la Junta Nacional, exclusiva o no, porque simplemente dicha Junta no tiene jurisdicción para conceder remedio alguno que impida violaciones de ese convenio. .Por lo tanto, la jurisdicción de la Junta Insular para conceder un remedio que no puede conceder la Junta Nacional—el de exigir el cumplimiento de las obligaciones bajo el convenio—no está afectada por la sección 10 (*a*) de la Ley Federal. No hay duda desde luego, de que la Junta Nacional puede impedir una conducta que intrínsecamente sea práctica ilícita de trabajo bajo la Ley Federal (v.g., la huelga de "boicot" secundario de octubre 22 a 29) y que al mismo tiempo sea violación de un convenio en su cláusula de no huelga. Pero el remedio que puede conceder la Junta Nacional prohibiendo aquello sobre lo cual se le ha conferido poder por la Ley Federal, no surte efectos más allá de los límites del poder conferídole. Y el ejercicio de tal autoridad no excluye la facultad de la Junta Insular para prohibir aquello sobre lo cual se ha conferido a ésta poder bajo la Ley local, y sobre lo cual no se le ha conferido a la Junta Nacional por la Ley Federal. No hay, en el ejercicio de su autoridad por la Junta Insular, conflicto alguno con la Ley Federal, porque el Congreso no ha "ocupado el campo", ni la reglamentación en una y otra jurisdicción gira alrededor de la misma práctica ilícita de trabajo, según ésta se define estatutariamente.

La Junta Insular se creó como un tribunal especializado para administrar la Ley Insular de Relaciones del Trabajo. Y aun cuando la aprobación de la Ley Taft-Hartley ha de-

jado en suspenso disposiciones diversas de la Ley Insular, por haber sido ocupado el campo por la Ley Federal, es lo cierto que el Congreso dejó la exigencia del cumplimiento de las obligaciones contractuales a "los procedimientos usuales de la ley", y no a la Junta Nacional. El Congreso no aceptó la proposición de que se declarara práctica ilícita de trabajo la violación de un convenio. Véase 1 *Legislative History of the Labor Management Relations Act* (1947) 111. *United Packinghouse Workers of America*, 25 L.R.R.M. 1556; *Old Line Life Insurance Co.*, 28 L.R.R.M. 1539; *Gen'l Bldg. Contractor's Ass'n* v. *Local Unions, etc.* (Pa., 1952) 87A. 2d 250, 21 Labor Cases 66,843.

Al no reglamentar el Congreso el campo de la violación de convenios colectivos en las relaciones obrero-patronales, la implicación es la de que "la política federal es indiferente, y toda vez que es indiferente a lo que el individuo por su propia voluntad puede hacer, sólo podemos suponer que es igualmente indiferente a lo que él puede hacer bajo la compulsión del estado." *Bethlehem Steel Co.* v. *New York Labor Rel. Bd.*, supra.

El amplio lenguaje usado por el Tribunal Supremo en los casos de *O'Brien* y *Amalgamated Asso.* en el sentido de que "el Congreso ha cerrado a la reglamentación estatal el campo de las huelgas pacíficas en industrias que afectan el comercio" debe leerse, como todo amplio lenguaje en una opinión judicial, a la luz de las circunstancias allí presentes. *Puerto Rico* v. *Shell Co.*, 302 U.S. 253, 82 L. ed. 235. En ambos casos la legislación estatal confligía con la federal por restringir derechos de los trabajadores, reconocidos por ésta. Es de notarse que en el de *O'Brien*—citándose luego con aprobación en el de *Amalgamated Asso.*—se refirió el Tribunal a que "Ninguna de estas secciones [8(*d*) y 8 (*b*) (4)] puede leerse como que permite reglamentación estatal concurrente de huelgas pacíficas por salarios más altos. El Congreso ocupó este campo y lo cerró a la reglamentación estatal." Al repetirse ese lenguaje en el de *Amalgamated Asso.*, seguido de las

citas de los de *Plankinton, La Crosse, Bethlehem* y *Hill* v. *Florida,* se refirió el Tribunal, en la nota 12, 340 U.S. 390, 95 L. ed. 373, a los *O'Brien* y *Plankinton* en la siguiente forma: "Nuestra decisión en *O'Brien,* 339 U.S. 454, 94 L. ed. 978, 70 S.Ct. 781, fué emitida poco después de nuestra revocación *per curiam,* en *Plankinton Packing Co.,* 338 U.S. 953, 94 L. ed. 588, 70 S.Ct. 491, donde la Junta de Wisconsin sobre Relaciones de Empleo, con la aprobación de la Corte Suprema Estatal, ordenó la reposición de un empleado despedido con motivo de no hacerse miembro de la unión, aun cuando su empleo no estaba cubierto por un contrato de taller cerrado o uno similar. La sección 7 de la Ley de Relaciones Obrero-Patronales garantiza no solamente el derecho a la propia organización y el derecho a la huelga, si que también garantiza a los empleados individualmente el 'derecho de no participar en cualquiera o en todas dichas actividades,' por lo menos en ausencia de un convenio de taller cerrado u otro similar aplicable al individuo. Toda vez que la JNRT le fué conferida jurisdicción para hacer valer los derechos de los empleados, claro es que la Ley Federal ha ocupado este campo con exclusión de reglamentación estatal. *Plankinton* y *O'Brien* demuestran ambos que los estados no pueden reglamentar con respecto a derechos garantizados por el Congreso en la sección 7."

La referida nota puede considerarse indicativa de que no obstante lo amplio del lenguaje usado tanto en el caso de *O'Brien* como en el de *Amalgamated Asso.,* al efecto de que el Congreso ha cerrado el campo a la reglamentación estatal de *huelgas pacíficas,* su alcance parece limitado a aquellas huelgas pacíficas que son actividades concertadas en el ejercicio de los derechos protegidos por la sección 7 de la ley. Y ya hemos dicho anteriormente, citando los casos de *Sands* y de *International Union* v. *Wisconsin Empl. Rel. Bd.,* que una huelga en violación de una cláusula de no huelga en un convenio no es una de esas actividades concertadas protegidas por la sección 7.

Pero aun cuando el lenguaje de los casos de *O'Brien* y

*Amalgamated Asso.* no tuviera la limitación apuntada, su doctrina no excluye la autoridad de la Junta Insular, bajo la Ley Local, para prohibir la práctica ilícita de violación de convenio—área no reglamentada por la Ley Federal—aun cuando bajo ésta los hechos en que tal violación se funde constituyan una práctica ilícita de trabajo.

Al declarar e instrumentar, por la Ley local, su política pública, la Asamblea Legislativa de Puerto Rico, en el uso de su poder policial, reglamentó un campo no ocupado por el Congreso e hizo claro su objetivo—vital para nuestra supervivencia de pueblo—de que las partes que voluntariamente adoptan un convenio colectivo deben honrar el mismo, y que si como resultado de la negociación colectiva se renuncia voluntariamente a la huelga, la violación de esa condición del convenio puede, y para llevar a cabo los propósitos de la ley debe, ser impedida. Esa política pública no sólo no conflige con la del Congreso, sino que más bien tiene como punto de partida el sitio en el que la Ley Federal dejó de expresar la política pública del Congreso en materia de violación de convenios.

El argumento de las querelladas de que la sección 301 (*a*) (¹⁰) de la Ley Taft-Hartley ofrece un remedio exclusivo no nos persuade. El derecho a ejercitarse por uniones y patronos bajo dicha sección, *Shirley–Herman Co.* v. *Internat'l Hod Carriers, Etc.*, 182 F.2d 806; *Schatte* v. *International Alliance, Etc.*, 182 F.2d 158; *Textile Workers Union of America* v. *Aleo Mfg. Co.*, 94 F. Supp. 626; Levinson, *Breach of Contract Under the Taft-Hartley Act*, 2 Labor Law Journal (abril, 1951) 279, es uno para beneficio privado de los patronos y las uniones, y en su ejercicio no juega papel alguno el

---

(¹⁰) Dicha sección dispone:

"Pleitos por violación de contratos entre un patrono y una organización obrera que represente empleados en una industria que afecta el comercio según se define en esta Ley, o entre cualesquiera de dichas organizaciones obreras, podrán iniciarse en cualquier corte de los Estados Unidos que tenga jurisdicción sobre las partes, sin respecto a la cuantía en controversia o sin relación a la ciudadanía de las partes."

interés público. Dicha sección, como puede verse de su texto, en efecto facilita la litigación en las cortes federales eliminando requisitos que, de otro modo, les impediría en ciertos casos obtener adecuada reparación por daños.

A la violación de una cláusula de no huelga se le ha llamado "el prototipo de todas las violaciones de convenio concebibles." Levinson, ob. y art. cit. Sin embargo, la violación de convenio no fué enumerada como una práctica ilícita de trabajo en la Ley Federal y, por ende, no está reglamentada en el sentido en que en otras áreas el Tribunal Supremo Nacional ha considerado "ocupado el campo" con exclusión de la reglamentación estatal. Al aprobar la sección 301(a) el Congreso si bien estableció la política respecto a la protección que la integridad de los convenios colectivos adoptados de acuerdo con la Ley Federal deben recibir, 2 Teller, *Labor Disputes and Collective Bargaining* (1950 Supp.), sec. 398.162, págs. 174, 175, no es menos cierto que esa política se manifiesta a través del ejercicio privado de un derecho, que se limita tan sólo a acciones de daños y perjuicios, y no a la concesión de remedios de injunction para impedir, por ejemplo, una huelga en violación de un convenio. Bajo cualquier circunstancia, el derecho establecido por la sección 301(a) fué conferido a las partes contratantes, y no puede de su texto, ni de su historia legislativa, inferirse que se intentó privar a los estado y territorios de ejercer su poder para reglamentar la conducta desdeñosa de las partes a ese convenio, cuando tal conducta pone en peligro la vida misma de la comunidad por sus efectos nocivos en la estructura básica de su economía, considerados todos los factores que la componen y la afectan.

La situación de Puerto Rico, que movió a la Asamblea Legislativa a declarar instrumentos de interés público los convenios colectivos adoptados voluntariamente por uniones y patronos en el proceso de libre negociación, no tiene paralelo en los Estados Federados de la Unión. Y no encontramos en la Ley Federal nada que impida a la Junta Insular, para efectuar propósitos de la Ley local, dictar una Orden de cesar

y desistir de una práctica ilícita de trabajo no incluída y tampoco en conflicto con aquélla, y para impedir la cual no le confirió el Congreso poder a la Junta Nacional.

Lo expuesto hasta ahora sosteniendo la jurisdicción de la Junta Insular para dictar su Orden a las querelladas de cesar y desistir de su práctica ilícita de violación de convenio, fué dicho teniendo presente la huelga del 22 al 29 de octubre de 1951—por la cual se violó dicho convenio en su cláusula de no huelga y se incurrió a la vez en una práctica ilícita de trabajo bajo la Ley Federal, sec. 8 (b) (4) sobre "boicot" secundario. Tal razonamiento sería aplicable *a fortiori* a la huelga constituída por las "asambleas permanentes" de noviembre y diciembre del mismo año. El argumento de las demandadas de que la celebración de dichas asambleas permanentes no constituyó violación alguna del convenio porque fueron convocadas de conformidad con la cláusula 29 del mismo, o sea, previa notificación de 48 horas a las compañías, no nos convence. Si bien la notificación para dichas asambleas se hizo de acuerdo con los términos del convenio, es lo cierto que éstas, al declararse en *permanentes* y prolongarse por varios días en espera de una oferta de aumento, degeneraron en un estado de huelga, en violación de la cláusula de no huelga. Es innecesario, por lo tanto, examinar aquí la contención de las querelladas de que, de ser cierta la conducta que se les atribuye en relación con las "asambleas permanentes", la misma constituiría práctica ilícita de trabajo bajo la Ley Federal, por constituir una negativa a negociar, secciones 8 (b) (3) y 8 (d) ; ni la de la Junta Insular de que no se trata, en cuanto a dichas "asambleas permanentes", de una práctica ilícita de trabajo bajo dicha ley. La Junta Insular actuó dentro de su jurisdicción al dictar su Orden de 14 de abril de 1951.

*La Cláusula sobre Taller Cerrado (Closed Shop).*

 Una más seria cuestión surge en este caso con motivo de la cláusula A del artículo I del convenio, la que en

él se denomina "Taller Unionado", pero que no es otra cosa que una cláusula típica de taller cerrado (*closed shop*).

Dicha cláusula dice así: [11]

"Será condición para su empleo que todos los trabajadores que se mencionan en el Artículo I de este convenio empleados actualmente por las Compañías o que éstas pudieran emplear en el futuro, sean miembros bona-fide de la Unión, con excepción de lo dispuesto más adelante en la Segunda Parte de este Convenio."

---

[11] Otras disposiciones pertinentes del convenio sobre dicho extremo, son las siguientes:

"B. Las Compañías sólo emplearán trabajadores que estén en posesión de su tarjeta de identificación de miembro de la Unión, correspondiente al mes o trimestre en curso, disponiéndose que el inspector de la Unión que encuentre a algún trabajador sin dicha tarjeta de identificación, notificará al capataz, quien vendrá obligado a sacarlo del trabajo y sustituirlo por un miembro de la Unión.

"C. La Unión se compromete a suministrar todos los trabajadores que se mencionan en el Artículo I de este Convenio que soliciten las Compañías para efectuar los turnos (el regular y los extraordinarios) de trabajo que se fijan en el Artículo I no sujetos a turnos, y las Compañías se comprometen a notificar a la Unión por escrito, con suficiente tiempo de anticipación (que no será no menos de 3 horas en todos los puertos) sobre el número de trabajadores que ésta debe suministrar para el turno de las 7:00 A.M. a las 4:00 P.M., y de continuarse los trabajos para empezar a las 4:00 P.M. y/o a las 12:00 M.N. las Compañías notificarán a la Unión en o antes de las 12:00 M.D. y el personal para la continuación de las operaciones será llamado a las 3:00 P.M. y 4:30 P.M. respectivamente, asimismo se conviene que la Compañía anunciará en las pizarras de los muelles la hora en que empezarán los trabajos así como la llegada de los barcos.

"D. En todos los puertos los trabajadores a emplearse por las Compañías serán suministrados por la Unión de una lista rotativa que será preparada por ambas partes dentro de un término de 30 días a partir de la fecha en que se firme este convenio. De esta lista la Compañía y la Unión llamarán el personal. Las partes se obligan a cumplir estrictamente el turno rotativo en el empleo del personal.

"En caso de que la lista no contenga suficientes hombres para cumplir con el compromiso contraído por la Unión, la Unión se compromete a obtener el personal adicional necesario.

"E. En caso de que la Unión no pueda suministrar todos los trabajadores solicitados por las Compañías una hora antes de comenzar los trabajos del turno correspondiente, las Compañías podrán emplear cualesquiera otros trabajadores, lo cual notificarán a la Unión, y los trabajadores así seleccionados terminarán el turno de trabajo para el cual fueron empleados, entendiéndose que lo aquí dispuesto no será aplicable al turno de trabajo que empieza a las 7 de la mañana."

En el convenio se incluyó también, bajo la letra F del propio artículo I, una cláusula sustituta que dice:

"Se hace constar que las Compañías y las Uniones en la aplicación de los párrafos precedentes de este Artículo observarán la legislación aplicable a las relaciones del trabajo. Cualquier determinación final que afecte la validez de este Artículo no anulará el contrato en ninguna de sus otras disposiciones, disponiéndose que en tal caso queda convenido que este Artículo, o la parte del mismo que fuere anulado, quedará sustituído por el artículo correspondiente del Convenio anterior, según quedara enmendado por la estipulación firmada por las partes el 10 de agosto de 1948, que en su texto original dispone lo siguiente:

" 'Membership in the union shall be a condition of employment on and after the 30th day following the beginning of such employment, provided the employer has no reasonable grounds for believing, (1) that such membership was not available to the employe on the same terms and conditions generally applicable to other members, and (2) that membership in the union was not denied or terminated for reasons other than failure of employee to tender the periodic dues and initiation fees uniformly required as a condition for acquiring or retaining membership in the union.'

"Esta cláusula sustituta se aplicará tomando en consideración los principios del Seniority, entendiéndose que para los efectos del Seniority, seniors son todos los trabajadores que a la fecha de la firma de este convenio figuran como empleados de las Compañías y temporeros son los que después de la fecha de la firma sean empleados."

En la vista oral de este recurso se afirmó que hay pendiente ante la Junta Nacional un procedimiento sobre práctica ilícita de trabajo en que está envuelta la validez de la cláusula de taller cerrado. En tal situación, no creemos apropiado entrar a considerar el *status* del convenio colectivo que nos ocupa por el efecto que en él pueda tener la presencia de la referida cláusula de taller cerrado ni examinar la contención de la Junta Insular de que a lo sumo una Orden de la Junta Nacional en dicho procedimiento haría académica la Orden que la Junta Insular nos pide pongamos en vigor.

La cuestión con que ahora nos confrontamos no estuvo ante la consideración de la Junta Insular en el procedimiento que dió origen a su citada orden, ni con relación a ella tuvo oportunidad de hacer conclusiones de clase alguna. Como dicha cuestión va más allá del funcionamiento técnico de la Ley Federal, pues sugiere un posible choque entre la política pública del Congreso, que proscribió el taller cerrado en los convenios colectivos, y la política pública de nuestra Asamblea Legislativa, que tiende a mantener su integridad una vez adoptados; y la suerte del convenio aquí envuelto depende de la determinación que en el procedimiento ante ella adopte la Junta Nacional y del alcance de las órdenes que pueda dictar en el ejercicio de su autoridad, no consideramos propio poner ahora en vigor la Orden de la Junta Insular.

*El caso será devuelto a dicha Junta para que una vez conocida la actuación de la Junta Nacional a ese respecto, pueda ajustar su orden a la situación de derecho que emane de dicha actuación.*