Puerto Rico Telephone Company, peticionaria, *v.* Junta de Relaciones del Trabajo de Puerto Rico y Unión de Empleados de la Industria del Teléfono de P.R., etc., demandados.

*Número:* JRT-64-5      *Resuelto:* 13 de abril de 1965

*Sifre & Ruiz Suria,* abogados de la peticionaria; *J. B. Fernández Badillo, Procurador General, Luis M. Rivera Pérez* y *Celia Canales,* abogados de la Junta recurrida.

Sala integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Hernández Matos y Santana Becerra.

EL JUEZ ASOCIADO SEÑOR SANTANA BECERRA emitió la opinión del Tribunal.

El 7 de octubre de 1963 la Unión de Empleados de la Industria del Teléfono juró un cargo ante la Junta de Relaciones del Trabajo de Puerto Rico contra Puerto Rico Telephone Co. Le imputó que violó y continuaba violando el Convenio Colectivo vigente entre ellas en su Art. XV, Sec. 4, al negarse a recurrir al Servicio de Conciliación y Arbitraje del Departamento del Trabajo para tratar de llegar a un acuerdo o solución final en cuanto a los despidos en masa, efectuados por la Compañía, de los miembros de la Unión querellante.

Con motivo de dicho cargo, el 20 de noviembre de 1963 la Junta expidió una querella, caso CA-2915, en que imputó a la Telephone Co. haber incurrido en una práctica ilícita del trabajo por violación de dicho Convenio Colectivo. La imputación se basó en los siguientes hechos alegados en dicha querella: Que el 8 de noviembre de 1962 la Compañía y la Unión firmaron un Convenio Colectivo con vigencia hasta el 27 de octubre de 1964; que dicho Convenio establecía en su Art. XV un procedimiento para ventilar las quejas y agravios surgidos en relación con las disposiciones contractuales; que para fines de septiembre de 1963, 43 empleados de la Compañía reclamaron el haber sido suspendidos de empleo y sueldo en violación del Convenio Colectivo y el asunto se había sometido al Comité de Querellas establecido por el convenio; que los delegados de la Unión en el Comité de Querellas solicitaron de la Compañía que facilitara cierta información para considerar si la suspensión de los empleados permanentes estaba justificada; que el Comité de Querellas no pudo ponerse de acuerdo porque la Compañía rehusó facilitar la información solicitada; que en vista de ello la Unión invocó el Art. XV del Convenio Colectivo en su Sec. 4, inciso (c) que permite acudir al Servicio de Conciliación y que la Compañía se negó y continuaba negándose a permitir la intervención de dicho

Servicio de Conciliación y también se había negado a designar un quinto miembro para discutir dicha intervención del Servicio de Conciliación así como la procedencia de la información solicitada.

La Compañía del Teléfono contestó la querella y expuso su posición. Interpuso como defensa afirmativa, entre otras: el que la Junta carecía de jurisdicción en el asunto por haber la Junta Nacional de Relaciones del Trabajo asumido jurisdicción básicamente sobre los mismos hechos mediante querella ya expedida y vista ante un Oficial Examinador, Caso Núm. 24-CA-1739, estando a esa fecha dicho caso pendiente de la decisión de la Junta Nacional.

## El Convenio

El Art. XV del Convenio Colectivo aplicable, dispone en su sección primera: "para los propósitos de este Convenio, una querella es definida como la alegación que hace uno o más empleados de la violación o violaciones a las disposiciones contractuales que se establecen en este convenio." En la Sec. 4 de dicho Art. XV se crea el Comité de Querellas compuesto por dos representantes de la Compañía y dos de la Unión que se reunirán en privado, con facultad para investigar los casos referidos a él, presentar evidencia, llamar testigos y resolver los casos por mayoría. El inciso (c) de esta Sec. 4, textualmente expone:

"Si este Comité no pudiera ponerse de acuerdo, recurrirá al Servicio de Concilación para que ayude a las partes a llegar a un acuerdo, excepto en aquellos casos en que las partes decidan no utilizar dicho Servicio. Si aun así las partes no lograran llegar a un acuerdo, designarán por mayoría a un quinto miembro ajeno a las partes, y cualquier decisión por mayoría de este Comité así constituído, será obligatoria para las partes."

Se estatuye en la Sec. 5 del Art. XV que si un empleado considera injusta su suspensión o separación podrá presentar su querella ante la Unión y la Unión a la Compañía, quien

·tiene el derecho de llamar al Comité de Querellas para resolver el asunto. Si a juicio del Comité de Querellas la suspensión o separación es injustificada el empleado será repuesto, sin menoscabo de sus derechos de antigüedad y con resarcimiento de lo que hubiere dejado de devengar. La Sec. 6 dispone que cualquier decisión rendida dentro del procedimiento para resolver querellas se aplicará solamente a la querella envuelta y no será precedente obligatorio para futuras reclamaciones, ni un precedente obligatorio en la interpretación del Convenio.

Otras disposiciones del Convenio que tienen relación con la cuestión litigiosa aparecen en el Art. XX, referente a "antiguedad", en el que se dispone que la Compañía tomará en consideración todas las calificaciones del empleado en casos de ascensos y separaciones (*lay offs*) y que la antigüedad prevalecerá de haber igualdad de calificaciones entre los empleados a considerarse, pero no se utilizará contra un empleado que por su habilidad, competencia y eficiencia y mejor hoja de servicio demuestre ser más útil que otro que meramente ha sido empleado por un período de tiempo más largo. En el Art. V se hace constar que las partes reconocen que este Convenio contiene todas las condiciones de trabajo acordadas y que serán las únicas condiciones de trabajo que regirán las relaciones entre las partes. En el Art. XIII se establece un sistema de taller unionado.

Básicamente aplicable lo es el Art. IV bajo el título "Derechos Reservados al Patrono", que dispone de la siguiente manera:

"Salvo como expresamente se limita por los términos de este Convenio, la Compañía retiene y retendrá el control exclusivo de todos los asuntos concernientes a la operación, manejo y administración de su negocio incluyendo, pero sin que esto se interprete como limitación, la administración y manejo de sus departamentos y operaciones, la organización y métodos de trabajo, la asignación de horas de trabajo, la dirección del personal, el derecho de emplear, reclasificar, transferir, disciplinar, sus-

pender, separar o pensionar empleados y, todas las funciones inherentes a la administración y/o manejo del negocio. Los derechos arriba mencionados serán usados para propósitos económicos y administrativos y no para discriminar contra la Unión o alguno de sus miembros."

## ANTE LA JUNTA NACIONAL

En virtud de cargos hechos por la Unión a la Compañía el 20 de marzo de 1963 en el sentido de que había incurrido y estaba incurriendo en prácticas ilícitas que afectaban el comercio bajo la Ley Nacional de Relaciones del Trabajo, la Junta Nacional, determinado que hubo que la Telephone Co. se dedicaba al comercio bajo las disposiciones de la Ley federal, asumió jurisdicción y radicó una querella contra la Compañía el 15 de agosto de 1963. Se alegó en la querella que en noviembre 8, 1962, la Compañía y la Unión habían firmado un Convenio Colectivo a expirar en 1964; que dicho Convenio no tenía disposición alguna relativa a la contratación con terceras personas de trabajo cubierto por el Convenio; que existía una cláusula de no acudir a la huelga y para la discusión y ajuste de las querellas por un Comité de Quejas. Que en distintas ocasiones, noviembre 9, 16 y 23 y diciembre 1, 1962, y en marzo 8 de 1963, la Compañía había contratado con otros cantidad sustancial de trabajo cubierto por el Convenio sin darle a la Unión en ninguna de dichas ocasiones notificación previa y la oportunidad de negociar colectivamente sobre dicha contratación, y como consecuencia de esos actos había despedido un número considerable de empleados, (unos 157) hasta marzo 8, 1963; que en marzo 14 la Unión acudió ante el Comité de Querellas en cuanto a los despidos de marzo 8, y en marzo 18 el Comité de Querellas se reunió y la Unión solicitó de la Compañía que le suministrara determinada información que le permitiera continuar los procedimientos ante dicho Comité y la solicitud de información incluía: (1) Volumen de negocio durante los meses de enero, febrero y marzo de 1963 comparado con noviembre, 1962

cuando se firmó el Convenio; (2) los ingresos obtenidos por la compañía de su volumen de negocio; (3) las cantidades economizadas por la Compañía como consecuencia de los salarios de aquéllos dejados sin empleo; (4) si alguien estaba realizando el trabajo que realizaba el personal separado y (5) cuánto economizaría la Compañía. Se alegó que la Compañía en esa ocasión y en todo momento se negó a dar la anterior información.

Se alegó además que desde noviembre 13, 1962 la Unión venía protestando contra la práctica de la Compañía de contratar con terceros trabajo cubierto por el Convenio Colectivo y la terminación de los empleos, sin haberle dado a la Unión notificación previa ni la oportunidad de negociar en relación con estas actuaciones, y que la Compañía reiteradamente se había negado y aún se negaba a cesar en dichas prácticas aduciendo que tenía el derecho a contratar unilateralmente trabajo con otros y a terminar los empleos, sin negociar el hecho con la Unión.

Por los actos descritos se imputó a la Compañía el haber incurrido en prácticas ilícitas bajo la Sec. 8(a)(1) y (5), y la Sec. 2(6) y (7) de la Ley Nacional de Relaciones del Trabajo, por cuanto esos actos afectaban sustancialmente el comercio entre los distintos Estados de los Estados Unidos y entre ellos y Puerto Rico, y tendían a crear disputas laborales que obstruían dicho comercio. La querella ante la Junta Nacional fue objeto de vistas entre octubre 7 y noviembre 6, 1963, (*) o sea, con anterioridad a la fecha—noviembre 20, 1963—en que se expidió la querella por la Junta de Puerto Rico.

■ A la fecha en que celebramos la vista oral de este caso, 17 de diciembre de 1964, y a la fecha en que finalmente nos quedó sometido, 28 de enero de 1965, ya la Junta Nacional, en 20 de noviembre de 1964, había decidido la controversia.

---

(*) 149 N.L.R.B. #84.

149 N.L.R.B. #84; Vol. 57 L.R.R.M., pág. 1397. Tanto por el hecho de que tomamos conocimiento judicial de las decisiones de la Junta Nacional de Relaciones del Trabajo, como por el hecho de que la querella ante esa Junta forma parte de la evidencia en este recurso y es un hecho esencial en cuanto al planteamiento de jurisidicción, *a fortiori* debemos tomar en cuenta lo resuelto por la Junta Nacional así como sus conclusiones de hecho y de derecho al resolver este caso.

La Junta Nacional ha emitido un fallo abarcador y amplio sobre la cuestión litigiosa sin omitir aspecto alguno. Resolvió primero, que la Compañía querellada ·cae plenamente bajo su jurisdicción y asumió jurisdicción plenaria sobre toda la controversia. Segundo, que con su conducta de haber contratado o subcontratado con otros trabajo que estaba cubierto por el Convenio Colectivo sin previa negociación con la Unión, creando así cesantías y la separación de grandes grupos de sus empleados que formaban parte de la unidad contratante, la Compañía había incurrido en prácticas ilícitas bajo la Ley Nacional de Relaciones del Trabajo.ˉ Rechazó la Junta la contención de la Compañía al efecto de que ella podía contratar con otros parte del trabajo y en consecuencia dejar cesantes a los empleados que lo realizaban sin tener que someter el asunto a negociación, para lo cual la Compañía invocaba sus prerrogativas de gerencia, administración y dirección del negocio bajo la cláusula patronal del Convenio (Art. IV), y lo dispuesto en el Art. V, antes citados. Decidió que la Compañía venía obligada a negociar con la Unión previamente sobre esa contratación, aun cuando el Convenio silenciara sobre el particular y el Art. V dispusiera que todas las condiciones de trabajo eran las allí pactadas en el Convenio; y que por lo tanto la Compañía había incurrido e incurría en una práctica ilícita en violación de la Sec. 8 (a) (5) y (1) de la Ley federal.

En tercer lugar, resolvió la Junta Nacional que la Compañía había incurrido e incurría en práctica ilícita—negativa

264

a negociar de buena fe—al negarse a suministrar la información requerida por la Unión en el curso de las reuniones ante el Comité de Querellas. Fue del criterio que la información solicitada era pertinente y necesaria para que la Unión pudiera inteligentemente evaluar y afrontar toda la situación pendiente ante el Comité de Querellas relativa a los despidos en masa y a la contratación unilateral con terceros del trabajo cubierto por el Convenio, así como que dicha información también era necesaria para permitirle a la Unión descargar su responsabilidad de ley en la administración del Convenio Colectivo. Sostuvo la Junta, contrario a la opinión de la Compañía, que el derecho de la Unión a obtener esa información no dependía de los términos del Convenio, ni era de índole contractual, sino que es un derecho legal que le surge bajo la Sec. 8 (d) de la Ley Nacional, sin que dependa tal derecho de que el mismo se hubiera incluido en el Convenio Colectivo. (¹)

La Junta Nacional hace constar el hecho que después de las discusiones de marzo 18 ante el Comité de Querellas sin llegarse a un acuerdo, la Unión invocó la intervención de un conciliador a lo cual se negó la Compañía por ser innecesario. Entonces propuso la Unión que se sometiera a arbitraje el hecho mismo de si la intervención del conciliador, según provisto en el Convenio Colectivo, podía ser solicitada unilateralmente por cualquiera de las partes o si debía ser solicitada por el Comité de Querellas en pleno; e independientemente de lo que resolviera el árbitro en cuanto a lo anterior, que se le sometiera también la determinación de si la Compañía estaba

---

(¹) A este respecto expresó la Junta en una declaración afirmativa de su jurisdicción y demostrativa de su actitud de no ceder la misma, que aun cuando a veces la Junta permite que una cuestión como la anterior sea objeto de arbitraje, ello era discrecional, y en este caso retenía su jurisdicción, primero, porque *el punto no giraba en torno a una interpretación del contrato* sino que el derecho a tener información era un derecho de ley a favor de la Unión y, segundo, porque la Compañía resistía el arbitraje y además existía el problema de si cada una de las partes podía invocar unilateralmente el servicio de conciliación.

obligada a suministrar evidencia sobre la alegada economía que invocaba como fundamento para los despidos. A esto no respondió la Compañía.

Concluyó la Junta Nacional que el acto de la Compañía de subcontratar trabajo unilateralmente no se debió a consideraciones discriminatorias contra los empleados o la Unión sino únicamente a consideraciones económicas o comerciales; y que los subcontratos se hicieron bajo un programa de expansión ordenado por la Comisión de Servicio Público de Puerto Rico. No obstante ese hecho, la Junta dispuso que la compañía cesara de subcontratar en el futuro unilateralmente sin negociar con la Unión y ordenó que negociara con la Unión sobre los efectos en la unidad de dichos subcontratos del pasado. Decretó que los despidos como consecuencia de esas prácticas ilícitas fueron ilegales y dispuso la reinstalación con paga de salarios dejados de percibir, de todos aquellos empleados dejados cesantes como resultado de tal conducta ilegal. (²)

La Junta ordenó afirmativamente que la Compañía suministrara a la Unión toda aquella información y datos necesarios para probar su reclamación y para que le permitiera descargar su responsabilidad estatutaria como representante de los empleados de la Compañía. Finalmente, se ordenó que la Compañía cesara y desistiera de toda esa conducta y actuaciones declaradas prácticas ilícitas por la Junta.

### ANTE LA JUNTA DE PUERTO RICO

El 12 de diciembre de 1963 se celebró la vista de la querella radicada ante la Junta recurrida. El Oficial Examinador halló que la Compañía había incurrido en una práctica ilícita del trabajo el Art. 8(1)(f) de la Ley de Relaciones

---

(²) La Junta hizo constar que el récord no identificaba de manera específica los empleados que quedaron afectados por la subcontratación y que pudiera ser que el despido de algunos de los 227 empleados no tuviera relación con dichos contratos, y dejó la cuestión a ser determinada en procedimientos subsiguientes sobre cumplimiento de su decisión.

del Trabajo de Puerto Rico por haber violado el Convenio Colectivo—no haber accedido a usar el Servicio de Conciliación—y recomendó que se ordenara a la Puerto Rico Telephone Co. la siguiente acción afirmativa: Reunirse en el Comité de Querellas para discutir los casos sometidos por 43 empleados de la Compañía que alegaban haber sido despedidos por ésta y permitir que un funcionario del Negociado de Conciliación y Arbitraje del Departamento del Trabajo participe en las negociaciones de tal Comité de Querellas. La Junta dictó Orden para que se tomara la acción afirmativa recomendada por el Oficial Examinador.

Surge del récord que los representantes de la Compañía y de la Unión en el Comité de Querellas habían estado considerando toda la situación surgida como consecuencia de los despidos en masa de los empleados de la Compañía por la subcontratación del trabajo, así como el asunto de la información.[3] Tenemos en evidencia en este caso las notas taquigráficas de los procedimientos de dicho Comité de Querellas de las reuniones celebradas el 1ro., 2 y 4 de octubre de 1963. En estas reuniones la Compañía asumió una posición idéntica a la asumida por ella en los procedimientos ante la Junta Nacional. Insistió en no discutir la cuestión general de los despidos por la subcontratación. Sostuvo que el Comité carecía de facultad para entrar en ese aspecto, bajo la definición de "querella" del Art. XV—la reclamación por un empleado de la violación de las disposiciones contractuales del Convenio—por ser la subcontratación una prerrogativa de gerencia bajo el Art. IV que no violaba pacto alguno y, siendo así, el Comité no tenía autoridad, según lo dispone el inciso (f) de la Sec. 4 de dicho Art. XV, "para alterar, enmendar, modificar, añadir o restar de las disposiciones" del Convenio.

---

[3] Surge también de la decisión de la Junta Nacional que esas conversaciones empezaron desde el 15 de noviembre de 1962 y de ahí en adelante siguieron frecuente y periódicamente durante el año 1963.

La Unión anunció que se proponía ventilar las querellas de 45 empleados despedidos desde el 1ro. de septiembre, 1963, y a ese efecto pidió de la Compañía en el Comité la siguiente información:

1. Volumen de negocio de la Compañía Telefónica durante los meses de noviembre, diciembre del '62; enero, febrero, marzo, abril, mayo, junio, julio, agosto y septiembre del '63.

2. Beneficios obtenidos por la Compañía del volumen de negocio computados a base de tales beneficios en forma mensual.

3. Cantidades que se ha economizado la Compañía por concepto de los salarios dejados de pagar a los despedidos.

4. Quién está realizando el trabajo que antes realizaba el personal despedido.

5. Qué cantidad la Compañía economiza por este concepto.

6. Razón específica para cada despido, indicando con claridad su causa.

7. Cuántos subcontratos ha efectuado la Compañía desde noviembre hasta el presente.

8. Valor y gastos en que ha incurrido la Compañía con motivo de estos subcontratos, o en otras palabras, el costo de estos subcontratos.

9. Clase de trabajo subcontratado.

10. Empleados que han comenzado a trabajar con la Compañía desde noviembre de 1962 por departamentos, o sea, los empleados nuevos.

11. Empleados "part time" en la Compañía, por departamento.

12. Horas extras que ha trabajado la empresa desde noviembre hasta el presente computadas a base de mensualidades y además por departamentos.

13. Cuántos jubilados, sus edades y sus nombres y cantidad que se le pasa como jubilación.

La Compañía se negó a suministrar dicha información en forma general por las mismas razones aducidas ante la Junta Nacional y en el Comité de Querellas, ya expuestas. Aceptó, no obstante, que en las querellas de los empleados despedidos podía estar envuelto un problema de violación del contrato por razón de la violación de la cláusula de "Antiguedad", y estuvo dispuesta en todo momento a considerar

ese aspecto, caso por caso. Estuvo dispuesta igualmente a suministrar, al ventilarse cada querella individualmente, la información solicitada bajo el número 6, o sea, la razón específica del despido en cada caso específico, así como cualquier otra información pertinente a cada empleado individual.

Así las cosas, acordaron las partes ventilar cada despido por separado a la luz de sus circunstancias y se llamó el caso de uno de los empleados y la Compañía suministró información de la razón de su despido. Sin embargo, la sustanciación del caso no prosperó debido a que la Unión insistió, antes de continuar, que se le suministrara toda la información general de tipo económico solicitada. La Compañía estaba dispuesta a suministrarla según resultara ser pertinente al caso. Ante esa situación, surgió un desacuerdo absoluto en el Comité de Querellas, no en los méritos del asunto, sino en cuanto a la manera en sí de cómo sustanciarlo. La Unión pidió entonces que se utilizara el Servicio de Conciliación. La posición de la Compañía fue al efecto de que como no había surgido un desacuerdo en los méritos de la querella porque aún no se había ventilado en sus méritos, la intervención del Servicio de Conciliación era prematura. En esas circunstancias terminaron los procedimientos habidos en el Comité durante los días 1, 2 y 4 de octubre de 1963. La Unión imputó entonces ante la Junta de Relaciones del Trabajo la violación por la Compañía, del Convenio, por negarse a utilizar el Servicio de Conciliación.

## El Problema de Jurisdicción

Por la anterior relación de los hechos, es incuestionable que la actitud y posición de la Unión y de la Compañía, respectivamente, en el Comité de Querellas durante los procedimientos de octubre 1, 2 y 4 de 1963 que dieron lugar a este recurso, no se diferencia en nada de la actitud y posición asumidas por ellas en los procedimientos ante la Junta

Nacional, y que el problema en controversia era el mismo: la política de la Compañía de subcontratación de trabajo y las inevitables pérdidas de empleo por tal razón. El récord demuestra que en esos procedimientos del Comité, de octubre 1, 2 y 4, la Unión no estaba interesada en dilucidar tanto la razón de un despido en particular o la posible violación de la cláusula de "antiguedad" entre los separados u otra razón puramente personal, como el tratar el problema general envuelto de la política de la Compañía de subcontratar trabajo creando así desempleo. Este problema, del cual el suministro de información era un derivado lógico, estaba ya bajo la consideración de la Junta Nacional en todos sus aspectos y consecuencias, con plena jurisdicción asumida por dicho organismo. Frente a la actitud descrita de la Unión en las reuniones de octubre no se explica, y el récord no ofrece explicación, porqué la controversia relativa al despido de esos 45 empleados, que la propia Unión atribuyó en el récord a las mismas consideraciones de los despidos hasta marzo—la subcontratación—no se elevó ante la Junta Nacional que ya entendía del asunto, y por el contrario, quiso someterse a un conciliador local que en las circunstancias dichas muy poco o nada efectivo podría hacer estando el caso *sub-judice* ante aquella Junta, invitándose así a un choque de jurisdicción con respecto a una empresa que de lleno cae bajo la legislación federal. Una ilustración de lo expuesto la da el hecho que en este momento, después de haber resuelto la Junta Nacional todo lo concerniente a la validez de la subcontratación unilateral y sus consecuencias—los despidos—carecería de fin práctico la acción afirmativa ordenada por la Junta recurrida al efecto de que se use el Servicio de Conciliación bajo el Convenio para aconsejar sobre una controversia ya adjudicada en ley. Y de intervenir un conciliador siquiera en cuanto a este grupo de empleados en particular, nada distinto podría hacer o recomendar contra lo ya resuelto por autoridad competente.

Este conflicto de jurisdicción se invocó por la Compañía ante la Junta. Sobre eso comenta el Oficial Examinador:

"Es posible que el argumento del patrono pueda eventualmente prevalecer. Hemos expresado en fecha reciente que el cambiante ritmo de las relaciones obrero-patronales en Puerto Rico acerca de modo acelerado el momento en que ha de producirse un inevitable choque entre el ejercicio de jurisdicción de la Junta Nacional de Relaciones del Trabajo e idéntica actividad por parte de la Junta de Relaciones del Trabajo de Puerto Rico.

Que el ejercicio de autoridad engendra conflictos de jurisdicción entre la Junta Nacional y las Juntas estatales allí donde las hay, o con las cortes de los Estados, y aun dentro de la misma área federal entre la Junta Nacional y las cortes de distrito, es un hecho incuestionable. Ese conflicto de jurisdicción legará al futuro una incalculable glosa judicial en todos los niveles de expresión. Sería superfluo citar o analizar decisiones por lo bien conocidas en esta rama del derecho.

■ Puerto Rico no puede sustraerse a esa situación. Aunque circunstancias especiales de su vida de pueblo y de su economía presentan quizás consideraciones también especiales en cuanto a la intervención federal en sus relaciones del trabajo, el problema pertenece a las altas esferas políticas que tienen que ver con la fijación de las relaciones federales de Estado Unidos con Puerto Rico. Mientras tanto, y hasta que esas relaciones se alteren o se modifiquen por los organismos políticos apropiados, no creemos que el choque o pugna de autoridad entre la Junta Nacional y la Junta de Puerto Rico tiene que venir siempre, necesaria e inevitablemente. Puede y debe evitarse ahí donde las circunstancias demuestran que no es necesario que ocurra tal choque si se aplica un buen discernimiento. No es aconsejable tampoco que ocurran choques, si pueden evitarse, en un forcejeo indeseable de autoridad o. de duplicidad de gestión con el consiguiente gasto superfluo de energías y de tiempo y la inevitable confusión.

Aquí, la autoridad de la Junta Nacional sobre la actividad de la Telephone Co., empresa en el comercio interestatal, no era siquiera debatible o meramente concebible bajo la norma de *Garmon*, sino que era una autoridad clara y libre de duda a la luz de los hechos envueltos. (⁴) Más aún, la Junta no cedió o renunció su jurisdicción y, por el contrario, la había ejercido plenariamente.

Somos conscientes que la jurisdicción de la Junta recurrida se ha invocado a base de violación del Convenio Colectivo. Ya, desde *Junta de Relaciones del Trabajo* v. *I.L.A.*, 73 D.P.R. 616, decidido en el año 1952, resolvimos que no estando la violación de los pactos de un Convenio Colectivo protegida por la legislación federal ante la Junta Nacional de Relaciones del Trabajo (se da remedio en las cortes de distrito, Sec. 301, 61 Stat. 156), y declarada por otra parte la violación una práctica ilícita bajo la legislación nuestra, la Junta de Puerto Rico tenía autoridad para intervenir con tal violación de convenio aun en el caso de entidades dedicadas al comercio interestatal y cubiertas por la Ley Nacional de Relaciones del Trabajo. Cualquier efecto que la decisión posterior de *Guss* v. *Utah Labor Board*, 353 U.S. 1, decidido en 1957, pudiera haber tenido sobre nuestra decisión en el caso de la *I.L.A.*, el efecto pudo también quedar neutralizado o la acción del Congreso más tarde, al enmendar en 1959— Ley Landrum—Griffin—, la Sec. 14 de la Ley Taft-Hartley de 1947. Y véase: *P.R. Telephone Co.* v. *Junta de Rel. Trabajo*, recurso #74, 86 D.P.R. 382 (1962), y la exposición de normas jurisdiccionales en *J.R.T.* v. *Milares Realty Inc.*, 90 D.P.R. 844 (1964).

La Junta descansa fuertemente en la decisión de 5 de noviembre de 1962, antes citada. Aparte de que lo que ahora

---

(⁴) *San Diego Unions* v. *Garmon*, 359 U.S. 236.

Véanse: *Plumbers' Union* v. *Borden*, 373 U.S. 690; *Liner* v. *Jafco, Inc.*, 375 U.S. 301; *Humphrey* v. *Moore*, 375 U.S. 335; *Guss* v. *Utah Labor Board*, 353 U.S. 1. Cf. *Carey* v. *Westinghouse Corp.*, 375 U.S. 261; *Smith* v. *Evening News Assn.*, 371 U.S. 195.

se resuelve no está en pugna con dicho fallo, existe una clara distinción, a los efectos de las normas aplicables, entre los hechos y la situación en el recurso #74 (*) y los de este recurso. En aquel caso estaba envuelto el despido de una empleada que envolvía cuestiones puramente personalísimas. Ella llevó su asunto al Comité de Querellas y luego a la Junta recurrida y también lo llevó ante la Junta Nacional. Prontamente la Junta Nacional se negó a intervenir o a asumir jurisdicción. Parece claro que la Junta Nacional no veía en ese despido problema alguno que afectara el comercio, distinto a su conclusión sobre el efecto perjudicial en el comercio de los despidos de este caso. De modo que el planteamiento de conflicto jurisdiccional que la Compañía hizo en el anterior recurso #74 ante la Junta primero, y que insistió en mantener ante nosotros en revisión, realmente no tenía razón de ser ya que de hecho no existía conflicto de jurisdicción alguno.

■ Aun cuando sea cierto que la Junta recurrida tenía facultad en ley para intervenir ante un cargo de violación del Convenio por la negativa a usar el Servicio de Conciliación, los hechos en el récord demostraban que la alegada violación recaía sobre un incidente menor, parte mismo e inseparable del problema básico envuelto bajo la atención de la Junta Nacional. En esas circunstancias nos parece, aun cuando existiera la facultad, que pudo ser mejor norma el que la Junta se abstuviera de ejercerla en uso de una buena discreción con que está investida como organismo tutelar de las relaciones del Trabajo.

### El Asunto en los Meritos

En vista de que la Junta recurrida ejerció jurisdicción aunque lo fuera sobre un aspecto limitado o residual dentro del problema general envuelto, consideramos la cuestión en los méritos en cuanto a tal aspecto.

---

(*) Nota del Compilador: 86 D.P.R. 382.

En su Decisión y Orden la Junta se expresó así:

"El patrono sostiene que la determinación sobre la propiedad del requerimiento de la Unión en el Comité de Querellas era imprescindible y previa a toda la determinación sobre la violación del Convenio que se le imputa en el presente caso. El Oficial Examinador en su informe no dictaminó sobre este particular. Adoptamos la posición del Oficial Examinador por considerar que el referido dictamen era inmaterial a los efectos de establecer la violación del Convenio imputada a la querellada. Las motivaciones, *méritos* o *causas* que tuvo la querellada para incumplir la obligación que asumiera el negociar colectivamente con la querellante la sec. 4(c) del Artículo XV del convenio colectivo, no son de la incumbencia de la Junta en el caso de autos." (Énfasis puesto.)

■ La anterior conclusión se ha impugnado por la Compañía en este recurso, a nuestro juicio, con razón. Se le imputó la violación del Convenio porque se negó a utilizar el Servicio de conciliación que la Unión quería utilizar. La controversia giró precisamente sobre la procedencia o no de dicho servicio en esa etapa cuando aún no existía desacuerdo entre las partes sobre los méritos de la querella que ventilaban. La Compañía sostenía que la intervención era prematura según interpretaba el Art. XV. Existía además el problema de interpretación de la Sec. 4(c) del Art. XV en cuanto a si una de las partes en el Comité de Querellas podía unilateralmente obligar a la otra a usar dicho Servicio o si el mismo tenía que ser requerido con la aceptación de ambas. De los anteriores criterios en discrepancia sobre la interpretación del Convenio en ese aspecto, no puede decirse que los de una u otra parte fueran enteramente frívolos o carentes de todo *mérito*. Habiéndose creado el desacuerdo que autoriza el uso del Servicio de Conciliación precisamente en cuanto a su uso, era necesario que o las partes mediante arbitraje, o la Junta recurrida en una interpretación del Convenio a la luz de los hechos resolvieran previamente que el uso del Servicio de Conciliación procedía en la etapa en que fue reque-

rido por la Unión y que procedía a petición sólo de una de las partes en el Comité de ·Querellas, para que se sostenga la conclusión final de violación del Convenio por parte de la Compañía. El error de considerar inmaterial dichas determinaciones, tuétano de la cuestión litigiosa, y de que no eran de la incumbencia de la Junta, requiere que se deje sin efecto la Orden recurrida.

Según queda dicho, el desacuerdo entre las partes concerniente al suministro de información está ya decidido por la Junta Nacional como un derecho de la Unión concedido por ley federal, independientemente del Convenio. Está resuelta también la controversia en cuanto a la validez de los despidos por la subcontratación, y sobre el poder de la Compañía de subcontratar trabajo unilateralmente. Como apuntamos antes, carecería de finalidad práctica la Orden de la Junta para que se obtenga la intervención de un conciliador que ayude a las partes a resolver esas discrepancias ya decididas. Pudiera ser, no obstante, en relación con los despidos aquí envueltos, que existan problemas de antigüedad o que existan despidos que respondan a otros motivos. (⁵)

*En las anteriores circunstancias se dejará sin efecto la Decisión y Orden de la Junta recurrida, con instrucciones de que devuelva el asunto al Comité de Querellas para que considere en los méritos las querellas por razón de despidos sobre cualquier aspecto que no se haya adjudicado ya, y de incurrir en desacuerdo en cuanto al uso del Servicio de Conciliación sobre cualquier asunto no decidido, preferiblemente someta el desacuerdo a arbitraje, por envolver el mismo una interpretación del propio Convenio. Se dictará sentencia de conformidad.*

---

(⁵) Parecido al récord ante la Junta Nacional, el récord ante nos no nos permite asegurar que todos los despidos objeto de este procedimiento se deban a la subcontratación.