# 97 DTA 137

**TRIBUNAL DE CIRCUITO DE APELACIONES**
**CIRCUITO REGIONAL VI DE CAGUAS/HUMACAO/GUAYAMA**
**PANEL I**

GENERAL ELECTRIC TECHNICAL SERVICES CO., INC.
Recurrente

v.

AUTORIDAD DE ENERGIA ELECTRICA

Recurrida

Núm. KLAA-96-00096

San Juan, Puerto Rico, a 24 de abril de 1997

Panel integrado por su Presidente, el Juez Brau Ramírez
y los Jueces Colón Birriel y Pesante Martínez

Brau Ramírez, Juez Ponente

## TEXTO COMPLETO DE LA SENTENCIA

### I

El presente recurso de revisión administrativa fue originalmente presentado ante el Tribunal de Primera Instancia, Sala Superior de San Juan, y posteriormente referido a este Tribunal, conforme a lo dispuesto por el art. 9.004, subinciso (a), de Ley de la Judicatura de Puerto Rico de 1994, según enmendada por la Ley Núm. 248 de 25 de diciembre de 1995.

La parte recurrente, General Electric Technical Services Co., Inc. *("General Electric"),* solicita la revisión de una resolución emitida el 22 de noviembre de 1995 por la Secretaría de Procedimientos Adjudicativos de la agencia recurrida Autoridad de Energía Eléctrica de Puerto Rico *("A.E.E.").* Mediante el dictamen en cuestión, la A.E.E. denegó la impugnación de subasta presentada por la recurrente y confirmó, de este modo, la decisión original de la A.E.E. de adjudicar la Subasta LJ-04970, sobre el proyecto Repotentación Unidades 5 y 6 de la Central Termoeléctrica de San Juan, a la corporación española recurrida Abengoa S.A. c/o Passco, Inc. *("ABENGOA").*

Confirmamos la resolución recurrida.

### II

Según se desprende del recurso, durante el mes de agosto de 1994, la A.E.E. anunció la Subasta LJ-04970 para el proyecto denominado *"Repotentación Unidades 5 y 6 de la Central Termoeléctrica de San Juan".* Dicho proyecto tiene el propósito de reemplazar dos (2) unidades de 44 megavatios (MW) de la planta ubicada en el área portuaria de Puerto Nuevo, adyacente a la Bahía de San Juan, por una planta de ciclo combinado consistente de dos (2) turbinas de gas en combinación con dos (2) turbinas de vapor con calderas de recuperación de calor para la generación de vapor, que añadirán más

de 370 MW de capacidad al sistema eléctrico de la Central de San Juan.

El 20 de septiembre de 1994 se celebró la reunión pre-subasta en la cual participaron las siguientes compañías: Maxon Engineering; ABB/Isidro Ramos; Flour Daniel Caribbean, Inc.; General Electric; Westinghouse Electric; Black & Veacth International; Bechtel; Foster Wheeler; Gilbert Commonwealth; Stone & Webster; R.G. Engineering; Distral de Puerto Rico; Abengoa S.A., c/o Passco, Inc.; National Power Div.; Badcock & Wilcox Española S.A.; y Kiewitt. Posteriormente, varias de estas compañías se unieron en consorcios.

El 23 de noviembre de 1994 se efectuó el acto de apertura de la subasta en el cual participaron ABENGOA; GETSO, consorcio formado por General Electric y Raytheon Cathalytic, Inc.; Badcock & Wilcox Española, S.A.; Kiewitt Industrial Co.; A.B.B./Metric Constructors; Black &\Veatch International; y Flour Daniel Caribbean, Inc.

La A.E.E. creó un Comité Evaluador *("el Comité")* con el fin de evaluar las ofertas sometidas por las compañías anteriormente mencionadas. El proceso de evaluación se realizó en dos (2) etapas. En la primera, se determinó cuáles ofertas cumplían con los requisitos básicos del proyecto. Aquellas compañías que pasaron dicha etapa fueron sometidas a la segunda etapa de evaluación en la cual se determinó cuál oferta era la mejor y la más beneficiosa para la A.E.E. Durante el mencionado período de evaluación, el Comité solicitó de todas las compañías que participaron en la subasta distintas aclaraciones de sus respectivas ofertas. Mediante carta suscrita el 20 de enero de 1995, el Comité solicitó a ABENGOA la siguiente información:

*"1. Please specify the manufacturer for the Combustion Turbine to be supplied.*

*2. Please clarify your proposal's Condenser Circulation Cooling Water System. Your clarification should include all flows, equipment, and their specific location that will be installed to meet the cooling water temperature requirement.*

*3. Please clarify the apparent conflict between Volume B (Page 8-A) and Volume C (Table 6, Section 17.3) in regard to the Selective Catalytic Reduction Equipment of your proposal. In Volume B the price for the system is specified as being optional while in Volume C it is stated that the price quoted for the equipment should be deducted from the bid price.*

*4. In various places of your proposal, the opacity values for the combustion turbine are identified. Please specify what opacity level is being guaranteed in your proposal and where such guarantee is stated."*

ABENGOA contestó dicha misiva el 27 de enero de 1995 señalando que:

*"1. The Combustion Turbine manufacturer is to be Westinghouse Electric Corp., model 501F.*

*2. Our proposal is a turn key job for two (2) combined cycle power sets in which we provided overall performance output, efficiency and emission values; therefore, the limitations stated by you of 50,000 gpm can be achieved. ABENGOA's proposal meets in full the sea water cooling flow limitations for the rated heat balance given in our proposal. Attached hereto you will find the calculations and number of heat exchangers to be installed in the roof top area of the generators to be removed, to comply with the 12' F limitation. We have guarantee from Westinghouse for the performance of the 501F Combustion Turbines, which exceed the 4,000 fired hours required in the specifications, and we will decide the final number of cooling heat exchanges after the performanced tests are carried out in the open cycle operations, without delaying the schedule and with PREPA's acceptance of the calculations.*

*3. The price of $ 2,378,475 given in the cover letter of our proposal clearly indicates this is an adder for each unit, if the Federal Agencies require it, and this offer supersedes any other discrepancies.*

*4. The opacity quarantee is 20% or less for the operating conditions, with 10% to 20% values typical for number 2 oil firing..."*

262

El 7 de abril de 1995, el Comité presentó una evaluación económica de las propuestas de ABENGOA, GETSO y Kiewtt-ABB y Kiewtt-GE. Para dicha evaluación, se utilizó el programa computarizado *"PROSCREEN"*, mediante el cual se evaluaron las posibles alternativas futuras para suplir la demanda, y como resultado se obtuvieron diferentes planes de expansion ordenados en forma ascendente a base de los costos totales. ▮

Además, se tomaron en consideración los siguientes parámetros: *"heat rate"*, costo de combustible, capacidad, costos de operación y mantenimiento, entre otros, tanto de las unidades existentes como futuras.

En torno al factor de capacidad anual mayor a lo largo de la vida esperada de las unidades o el equipo, en la mencionada evaluación se presumió que era equivalente a un 75% para todas las alternativas incluyendo el efecto del mantenimiento y la tasa de avería forzada. Los costos de operación y mantenimiento fijo y variable se basaron en unidades típicas de ciclo combinado del informe *"Technology Characterization Resource Planning Assumptions"*. Tanto los costos de operación fijo ($kw) como el variable (¢kwh) se ajustaron debido a las diferencias en capacidades de las propuestas.

La mencionada evaluación económica determinó que la propuesta menor era de ABENGOA y recomendaba que la subasta fuese adjudicada a dicho consorcio. Expresaba:

*"Aunque la propuesta de ABENGOA resultó ser la propuesta más económica, la oferta de General Electric (segundo en orden) tiene un rendimiento térmico menor que la propuesta de ABENGOA. Esto significa que mientras mayor sea el factor de capacidad al cual se despacharían estas unidades, menor será la diferencia en costos entre ABENGOA y General Electric. Por esta razón se calculó el factor de capacidad para el cual los costos totales de las dos propuestas resulta ser igual. El factor de capacidad obtenido fue de 74.6%. Es decir, si la máquina opera a un factor de capacidad mayor de 74.6% anual a lo largo de la vida esperada de la máquina, la propuesta de General Electric resulta ser la más económica...En este estudio se presumió una disponibilidad equivalente de 75% y las unidades se despachan a un factor de capacidad entre 30 y 40% para los años posteriores al 2005. En el escenario en que uno de los cogeneradores no esté disponible el factor de capacidad no sobrepasa el 45%. Por lo tanto, recomendamos la propuesta de ABENGOA."*

El 29 de abril de 1995, luego de presentadas las restantes evaluaciones comerciales y técnicas, el Comité rindió un informe recomedando la adjudicación de la subasta a ABENGOA. Concluyó que ABENGOA había cumplido con todos los requisitos y especificaciones de la Subasta LJ-04970, y que, además, era el licitador con la oferta más económica y adecuada para las necesidades de la A.E.E. Dicha agencia acogió la mencionada recomendación, y el 22 de septiembre de 1995 adjudicó la subasta a favor de ABENGOA, lo cual, posteriormente, notificó a los demás licitadores.

El 2 de octubre de 1955, General Electric suscribió una carta a la División de Suministros de la A.E.E. solicitando que se le indicaran las razones por las cuales no se adjudicó la subasta LJ-04970 a su favor, y que se le permitiera inspeccionar la copia de la licitación que fue sometida por ABENGOA el día de la apertura de la Subasta. Dicha agencia contestó la misiva indicando que General Electric no fue el postor mejor evaluado, y que, con respecto a la segunda solicitud, no podía suministrarle información que aplicara a terceros.

El 5 de octubre de 1995, General Electric presentó una moción de reconsideración ante la Secretaría de Procedimientos Adjudicativos de la A.E.E. solicitando la revocación de la adjudicación de la Subasta LJ-04970 a favor de ABENGOA, y la adjudicación de dicha subasta a su favor. Alegó que ABENGOA incumplió con los requisitos mínimos del pliego de especificaciones de la Subasta en cuestión debido a la siguientes razones: 1) no especificó la marca o el fabricante de las turbinas de combustión; 2) ofreció para el control de emisiones atmosféricas de NOx un equipo denominado *"Selective Catalytic Reductor"* (SCR) con eficiencia de un 50% cuando las especificaciones requieren que dicho equipo garantice una eficiencia de 85%; 3) al tener una cotización de una turbina de vapor 70MW, según se desprende de sus *"Performances Guarantees"* que provocará que la circulación del agua del condensador sea mayor de los 50,000 G.P.M. requeridos produciendo un incremento en la temperatura de las aguas que se descarguen al mar superior a los 12bF establecidos como límites

térmicos para la descarga de dicha agua; 4)al indicar que el precio total expuesto en su oferta no incluia el requerido costo del trabajo de remoción de materiales tóxicos; y 5) al garantizar un *"power output"* o una capacidad de generación de energía que, según los cálculos de General Electric, presenta una deficiencia de 631 KW.

Alegó, además, que la evaluación económica de las ofertas no se realizó de acuerdo a los criterios establecidos en el pliego de especificaciones de la Subasta debido a que el Comité no consideró correctamente el Costo de Ciclo de Vida de un equipo o sistema. A esos efectos, alegó que el mencionado pliego de especificaciones expresa que el factor de capacidad considerado en la evaluación será el siguiente:

*"3.0 PERFORMANCE REQUIREMENTS*

*3.1 General*

*The nature of the system of which this equipment will be part is that of a staged construction repowering project which will operate as a base loaded combined cycle facility to provided electric power. Therefore, the prime design criteria are reliability and availability, followed by maintainability and the maximization of operational efficiency. The Contractor shall provide equipment which will operate twenty-four hours per day (24), for a total of 7300 operating hours per year. The duty cycle for the equipment shall be operation at full capacity with shutdown with every third or fourth day, depending on scheme selected, with cold restart."*

La recurrente alegó que, no obstante estos requisitos, la A.E.E., al realizar su evaluación del Costo de Ciclo de Vida del equipo, utilizó unos modelos económicos de optimización con valores sobre el factor de capacidad distintos o menores a los requeridos por el pliego de especificaciones. Según la recurrente, las especificaciones requerían una planta de ciclo combinado cuyo equipo operara por 7,300 horas al año *("full capacity")* o a un factor de capacidad de 83.3%. ■

Por último, General Electric alegó en su moción de reconsideración que ABENGOA no cuenta con la suficiente pericia y experiencia para llevar a cabo los trabajos presentados en la subasta debido a que, en síntesis, dicha compañía no está inscrita en el Registro Mercantil de San Juan.

El 13 de octubre de 1995, la Secretaría de Procedimientos Adjudicativos de la A.E.E., notificó a General Electric que había acogido su moción de reconsideración y que, posteriormente, se emitiría una resolución final en torno a la impugnación de la subasta. General Electric presentó una moción en auxilio de jurisdicción ante dicha Secretaría, la cual fue declarada Con Lugar paralizándose el otorgamiento del contrato con ABENGOA referente a la Subasta LJ-04970.

Luego de varios trámites procesales, el 22 de noviembre de 1995 la Secretaría de Procedimientos Adjudicativos emitió una resolución declarando No Ha Lugar la moción de reconsideración presentada por General Electric y confirmando la adjudicación de la Subasta LJ-04970 a favor de ABENGOA.

Concluyó, en torno a las objeciones presentadas por la recurrente, que:

*"...1) Al examinar la propuesta de ABENGOA, nos percatamos que el modelo referente a la turbina se establece claramente en los datos establecidos por ABENGOA en el documento denominado: "Combustion Turbine Performance" (Tab. 3 del Vol. C de la propuesta de ABENGOA) y donde se identifica a la turbina como "Expected 501F Combustion Turbine Performance". De igual forma, el esquemático unifiliar del Tab 10 de la propuesta ABENGOA establece que el fabricante es Westinghouse. No obstante esta información, el Comité evaluador solicitó que ABENGOA clarificara este aspecto en una carta de fecha de 20 de enero de 1995...a lo cual ABENGOA contestó en su carta de 27 de enero de 1995...como sigue: "The Combustion Turbine Manufacturer is to be Westinghouse Electric Corp., MQdel 501F..."*

2) Sobre el segundo aspecto, hemos revisado las especificaciones de la subasta (las cuales son reproducidas por la Peticionaria en su Moción de Reconsideración) y encontramos que las mismas, no

obstante establecen un 85% de eficiencia mínima para los equipos *"SCR";* ciertamente establecen que este es un equipo opcional cuyos requisitos finales de efectividad estarán sujetos a las exigencias de las agencias reguladoras ambientales. Este hecho ciertamente denota que la cantidad de eficiencia de los 85% podría variar dependiendo la determinación final de las agencias reguladoras. Al examinar la oferta de ABENGOA, hemos encontrado que no empece a que dicha Compañía especificó ofrecer un SCR de 50% de efectividad, la misma realizó una oferta a la Autoridad ciertamente superior a la oferta de la Peticionaria. Al momento de someter su propuesta, ABENGOA sometió una carta de intención fechada 17 de noviembre de 1994... en donde dicha compañía estableció que:

*"Muy Sres. nuestros:*

*Adjunto les presentamos nuestra mejor oferta para la repotentación de la unidades 5 y 6, Central San Juan, siguiendo en todo las especificaciones emitidas por uds. con sus anexos, preguntas y respuestas. Queremos señalar que nada en los párrafos anteriores, ni en los siguientes, debe entenderse como desviación de la oferta que presentamos, a las especificaciones y requerimientos de Uds. Por tanto si existiese algún aspecto que difiera de los mismos debe considerarse nulo y si fuese alguna exigencia, aparentemente faltante, debe considerarse incluida, a costo nulo y elección de PREPA."*

Ciertamente, la oferta antes transcrita constituye el compromiso de ABENGOA de ofrecer el equipo la efectividad que finalmente establezcan las agencias reguladoras sin costo mayor para la Autoridad. En otras palabras, ABENGOA, aceptó producir el equipo *"SRC"* que cumpliera con el porcentaje final de eficiencia que establecieran las agencias reguladoras por el precio tope para la Autoridad que nunca sería mayor a los cuatro millones setecientos cincuenta y siete dólares ($4,000,757.00). Esta oferta choca con la ofrecida por la peticionaria, la cual sería más costosa a la Autoridad si las agencias reguladoras exigen un *"SCR"* de mayor efectividad. No vemos como la Autoridad pudiera rechazar una oferta económica como la que hiciera ABENGOA, la cual ciertamente fue hecha con el propósito de satisfacer cualquier exigencia de licenciamiento ambiental...

............

3) ABENGOA clarificó su posición en su carta de fecha del 27 de enero de 1995... y en donde dicha Compañía estableció la forma en la cual se cumplirá con el requisito de 12'F. ABENGOA sometió entonces un documento titulado: *"Waterflow Diagram"* Air Heat Excharger que materializaría el que el agua a ser descargada al mar cumpliera con los 12'F de las especificaciones. No vemos que error alguno se haya cometido...

4) No vemos defecto alguno en la oferta presentada por ABENGOA por cuanto dicha Compañía estableció en su oferta los precios unitarios para la remoción de cada contaminante. En este sentido, es forzoso concluir que el Comité evaluador obtuvo la cantidad total de los costos de remoción de los contaminantes dadas en las especificaciones por la Autoridad. Ciertamente, esta forma de licitación le permitía a la Autoridad conocer los precios de ABENGOA en caso de que las cantidades de materiales tóxicos aumentaran o se reducieran...

5) Al examinar detenidamente la licitación de ABENGOA en este aspecto, hemos notado que la diferencia de 631 KW reclamados por la Peticionaria obedece a un simple error matemático de su parte. Dicho error consiste en que la parte Peticionaria toma en consideración que los referidos 631 KW usados faltantes corresponden a los KW usados por el equipo auxiliar de la turbina y que fueron incluidos por las especificaciones en el *"auxiliary power comsumption".* La parte Peticionaria incurre en el error de restar dichos 631 KW dos veces. Los resta en el *"auxiliary power comsumption"* y en el *"comsumption turbine net output".* Ciertamente, si corregimos este error matemático, la oferta de ABENGOA cumple con la totalidad de la energía garantizada...

6) A nuestro juicio, la parte peticionaria incide en error al concluir que los costos de generación para ambas propuestas serían simulados tomando como base el criterio de 7,300 horas de operación a toda capacidad *("full capacity").* Al examinarse las especificaciones de la subasta, encontramos que las referidas 7,300 horas obedecen a una medida para corroborar la durabilidad del equipo *(duty cycle for*

*the equipment)* en su uso por dicho término de horas. Esta medida fue utilizada por la Autoridad para medir solamente la durabilidad del equipo. La misma no necesariamente significa que las unidades serían utilizadas ininterumpidamente por 7,300 horas a toda capacidad (full capacity), para dar así el alegado factor de capacidad (capacity factor) de 83.3% para las unidades ofrecidas por los licitadores. Esta última conclusión de la Peticionaria es una incompleta a nuestro juicio, ya que para obtener el referido factor de capacidad (capacity factor) era necesario tener, además, información precisa sobre el costo del combustible que consumirían dichas unidades y la eficiencia propuesta por cada fabricante en los sistemas de generación y de esta forma realizar una simulación de un despacho económico dentro del sistema eléctrico de la Autoridad. Ante esta realidad, no vemos como la parte Peticionaria puede concluir que las especificaciones de la subasta requería un (capacity factor) de 83.3%. A nuestro juicio, la parte Peticionaria confunde los términos de *"duty cycle"* y *"capacity factor"*, los cuales son totalmente distintos...".

7) Esta alegación final de la parte demandante no tiene a nuestro juicio mayor importancia por cuanto ABENGOA, S.A. fue evaluada y admitida al registro de Suplidores de la Autoridad de conformidad se establece en el Reglamento de Subastas de esta corporación pública...

Insatisfecha con dicho dictamen, el 4 de diciembre de 1995 General Electric presentó una petición de revisión ante el Tribunal de Primera Instancia, Sala Superior de San Juan, reiterando los planteamientos presentados en su moción de reconsideración. Además, presentó una petición de injuction preliminar solicitando que se mantuviera el *status quo* hasta tanto se resolviera la controversia y, por consiguiente, la A.E.E. se abstuviera de otorgar el contrato referente a la Subasta LJ-04907. Esta última petición fue declarada No Ha Lugar por la ilustrada Sala del Tribunal Superior.

Posteriormente, General Electric solicitó al Tribunal de Primera Instancia una vista oral, la cual fue denegada por resultar prematura. Mediante resolución emitida el 7 de febrero de 1996, dicho foro determinó expedir el auto solicitado ordenando a la A.E.E. elevar al tribunal el expediente administrativo, y a ambas partes presentar sus respectivos alegatos.

Luego de varios trámites procesales, el recurso de revisión pendiente ante el Tribunal de Primera Instancia fue referido a este Tribunal, mediante orden administrativa emitida el 19 de junio de 1996.

La recurrente compareció ante nos presentando su alegato y, además, una nueva petición de *injunction* preliminar solicitando que se prohibiera el inicio de la construcción del proyecto referente a la subasta en cuestión. Posteriormente, presentó una moción en auxilio de jurisdicción reiterando los planteamientos esbozados en el mencionado *injunction* preliminar, la cual fue declarada No Ha Lugar mediante resolución emitida por este foro el 27 de septiembre de 1996.

Mediante resolución emitida el 30 de septiembre de 1996, concedimos a la parte recurrida un término para presentar su alegato.

La agencia recurrida compareció ante este Tribunal, mediante *"Moción en Cumplimiento de Orden"*, solicitando la desestimación del mencionado recurso de revisión por falta de jurisdicción. Oportunamente, la recurrente presentó su oposición a la moción de desestimación. Posteriormente, la recurrente también presentó una moción solicitando una vista oral, la cual fue denegada por este Tribunal mediante resolución emitida el 4 de diciembre de 1996.

Habiendo comparecido la parte recurrida, estamos en posición de resolver.

### III

En su recurso, la recurrente plantea que erró la A.E.E. al adjudicar la subasta a favor de ABENGOA debido a que, en síntesis, dicha compañía incumplió con varias de las especificaciones de la subasta, y con el Reglamento de Subastas de la A.E.E. al no registrarse en el Registro de Proveedores.

*"La buena administración de un gobierno es una virtud de democracia, y parte de una buena administración implica llevar a cabo sus funciones como un comprador con eficiencia, honestidad y corrección para proteger los intereses y dineros del pueblo al cual dicho gobierno representa."*

*Mar-Mol Company, Inc. v. Administración de Servicios Generales,* 126 D.P.R. 864, 871 (1990).

Para dar cumplimiento a estas metas, de ordinario se exige que el gobierno realice la adquisición de los materiales y servicios que necesita por medio de subastas donde los distintos proveedores puedan competir. Los sistemas de subastas gubernamentales persiguen proteger los intereses y dineros del pueblo, al promover la competencia de manera que el Estado logre que se realice la obra al precio más bajo posible; y, además, evitar que haya favoritismo, corrupción, extravagancia y descuido al otorgar los contratos, al requerir que la subasta se adjudique al postor más bajo. *Id.; Cancel v. Municipio de San Juan,* 101 D.P.R. 296, 300 (1973); *Justiniano v. E.L.A.,* 100 D.P.R. 334, 338 (1971); *Benítez Rexach v. Municipio,* 43 D.P.R. 734, 739 (1932).

Lo anterior, sin embargo, no implica que las agencias no gocen de ninguna discreción en la evaluación de las distintas propuestas sometidas. Cuando se trata, como en el presente caso, de la adquisición de equipo técnico de gran costo y sofisticación la selección de un proveedor sobre otros puede conllevar decisiones que descansen, no en criterios puramente matemáticos, sino en una valoración de la tecnología a la luz de las necesidades actuales y futuras de la agencia.

Cualquier individuo que ha adquirido un equipo estereofónico, una computadora, o un automóvil en nuestra sociedad, sabe que la decisión de adquirir este tipo de enseres, a menudo requiere una sobria apreciación de factores intangibles, tal y como la *"calidad"* del equipo, lo que, muchas veces suele ser una cuestión de juicio, subjetiva, que no puede ser reducible a una mera operación matemática de comparar, en dólares y centavos, cuánto cuesta un equipo u otro.

Al gobierno, quien de ordinario viene obligado a hacer compras en una escala muy superior a cualquier individuo o entidad privada, no puede requerírsele menos discernimiento en este tipo de transacciones. Al contrario, dada la magnitud social de sus decisiones, las dificultades que enfrenta el gobierno son mayores y hacen difícil anticipar y articular en un pliego de especificaciones todos los factores que pudieran incidir en la evaluación de las distintas ofertas de este tipo de equipo.

Lo anterior, desde luego, no implica que pueda o deba excusarse al gobierno de tomar una decisión razonable y ponderada en sus adquisiciones, orientada hacia el bienestar público o que se le exima de actuar de forma objetiva, cuando ello es posible. Pero la decisión del gobierno de adjudicar una subasta en áreas preeminentemente tecnológicas a menudo tiene una dimensión de política pública que requiere un grado de deferencia por los tribunales. Se impone, en estos casos, un balance entre el interés de un proceso formal y neutral que garantice la honestidad en el manejo de los fondos públicos y la existencia de un grado de flexibilidad en la toma de la decisión final por la agencia, que le permita ejercitar su juicio al comprometer al Estado a la utilización de determinado servicio o tecnología.

Nuestro ordenamiento establece, en este sentido, que el factor predominante lo es el interés público. Se ha reconocido, por ejemplo, que una agencia tiene derecho de revocar la adjudicación de una subasta, antes de que se formalice el contrato correspondiente, cuando determina que la misma no es conveniente a la sociedad. Véanse, *C. Const. Corp. v. Municipio de Bayamón,* 115 D.P.R. 559, 563 (1984); *Cancel v. Municipio de San Juan,* 101 D.P.R., a las págs. 300-301; *Justiniano v. E.L.A.,* 100 D.P.R., a la pág. 340; compárese, 21 L.P.R.A. sec. 4506 (Supl. 1996) (subasta puede ser adjudicada a un postor *"que no sea necesariamente el postor más bajo o el más alto, según sea el caso, si con ello se beneficia el interés público"*); véase además, la sec. 10, art. A(5) del Reglamento de Subastas de la A.E.E., Reglamento Núm. 4897, del 25 de marzo de 1993.

Lo determinante, en última instancia, es que la decisión tomada sea la más razonable y beneficiosa para el interés público, dentro de los parámetros y valores que el gobierno pudiera legítimamente considerar más importantes.

En la situación de autos, la A.E.E. adjudicó la subasta a ABENGOA quien resultó ser, efectivamente, el postor más bajo en la subasta. Significativamente, la parte recurrente no cuestiona que ABENGOA hubiera sometido una propuesta más económica a la suya sino que alega que la oferta presentada por ABENGOA no cumplió con todos los requisitos y especificaciones de la Subasta.

La agencia, según hemos visto, también determinó que la oferta de ABENGOA era la más

adecuada para las necesidades e intereses de la agencia. Dicha conclusión se basó en las evaluaciones económicas, comerciales y técnicas realizadas por el Comité Evaluador, compuesto por peritos especializados designados por la A.E.E. para evaluar todas las ofertas presentadas por los licitadores participantes en la Subasta en cuestión.

La doctrina reiterada del Tribunal Supremo de Puerto Rico es que las decisiones de los organismos administrativos merecen gran deferencia y respeto por los tribunales, en consideración a la experiencia y peritaje que gozan dichos organismos en las áreas dentro de su competencia. Véanse, *Maisonet Felicié v. Corp. Fondo del Seguro del Estado,* \_\_\_ D.P.R. \_\_\_ (1996), **96 J.T.S. 169**, a la pág. 454; *San Vicente Frau v. Policía de Puerto Rico,* \_\_\_ D.P.R. \_\_\_ (1996), **96 J.T.S. 148**, a la pág. 332; *Metropolitana, S.E. v. A.R.P.E.,* \_\_\_ D.P.R. \_\_\_ (1995), **95 J.T.S. 39**, a la pág. 767; *La Facultad para las Ciencias Sociales Aplicadas, Inc. v. Consejo de Educación Superior,* \_\_\_ D.P.R. \_\_\_ (1993); **93 J.T.S. 88**, a la pág. 10783; *Rubín Ramírez v. Trías Monge,* 111 D.P.R. 481, 484-485.
Un tribunal apelativo no habrá de intervenir con las determinaciones de los organismos administrativos salvo que éstos hubiesen actuado arbitraria o ilegalmente o en forma tan irrazonable que su actuación hubiese constituido un claro abuso de discreción. Véanse, *Fuertes v. A.R.P.E.,* \_\_\_ D.P.R. \_\_\_(1993), **93 J.T.S. 165**, a la pág. 11,385; *Murphy Bernabé v. Tribunal Superior,* 103 D.P.R. 692, 699 (1975).

Las determinaciones de hechos realizadas por la A.E.E. en este caso tienen a su favor una presunción de regularidad y corrección que prevalece mientras la parte que las impugne no produzca suficiente evidencia para derrotarlas. Véanse, *Maisonet Felicé v. Corp. Fondo del Seguro del Estado,* **96 J.T.S. 88**, a la pág. 454; *La Facultad para las Ciencias Sociales Aplicadas v. Consejo de Educación Superior,* **93 J.T.S. 88**, a la pág. 10,785; *López Vives v. Policía de Puerto Rico,* 118 D.P.R. 219, 229-230 (1987); *Díaz Marín v. Mun. de San Juan,* 117 D.P.R. 334 (1986).

Dichas determinaciones, así como las conclusiones de derecho realizadas por dicha agencia, no serán alteradas si están sostenidas por evidencia sustancial que obra en el expediente administrativo considerado en su totalidad. Véanse, *Metropolitana, S.E. v. A.R.P.E.,* **95 J.T.S. 39**, a la pág. 767; *Hilton Hotels v. Junta de Salario Mínimo,* 74 D.P.R. 670, 686 (1953).

En el caso de autos, entendemos que la decisión de la agencia recurrida está sostenida por evidencia sustancial en el récord. En su alegato, la recurrente alegó que la oferta presentada por ABENGOA incumplió con ciertas especificaciones de la Subasta en cuestión. Sin embargo, del recurso ante nos surge que ante la solicitud de la A.E.E., ABENGOA presentó cartas y otros documentos necesarios para aclarar su oferta supliendo toda la información necesaria para que la agencia recurrida pudiera evaluar su oferta y concluir que esta compañía era el mejor postor. [3] Anteriormente en esta sentencia, hemos reproducido en detalle el razonamiento y explicaciones ofrecidas por la agencia ante la impugnación presentada por la parte recurrente. Las mismas nos parecen enteramente razonables y justifican la decisión tomada.

La recurrente alega que el Comité Evaluador no evaluó correctamente el Costo por Ciclo de Vida del equipo o unidades, lo que hubiera reflejado que su propuesta era superior a la de ABENGOA. La controversia entre las partes, sobre este particular, aparentemente obedece a que el Comité y General Electric utilizaron metodologías distintas para calcular el factor de capacidad anual a lo largo de la vida esperada del equipo o unidades a utilizarse en el proyecto de repotentación.

El Comité utilizó, en sus cómputos basados en el Programa *"PROSCREEN",* un factor de capacidad equivalente a un 74.66 (75%), mientras que General Electric entendió que el parámetro requerido era de un 83.3% (83%) basado en la citada sec. 3.1 sobre *"Performance Requirements"* de las especificaciones, mencionada anteriormente, la cual, aunque no mencionaba categóricamente este concepto, establecía un criterio de 7,300 horas de operación del equipo a toda capacidad *("full capacity"),* las que equivalen a un 83.3% dentro del período de un año.

Conforme a la Ley de Conservación de Energía Eléctrica, Ley Núm. 69 de 8 de junio de 1979, el Sistema de Costo de Ciclo Vida es una técnica de compra que toma en consideración el precio de adquisición, los gastos de operación y mantenimiento, al igual que otros gastos relacionados con la propiedad o pertenencia de un equipo. 3 L.P.R.A. sec. 935. Dicha ley requiere la aplicación del

mencionado sistema para la determinación de los requisitos mínimos de eficiencia energética de todo equipo que el Gobierno de Puerto Rico deba adquirir o comprar. A esos fines, la A.E.E. adoptó el Sistema de Costo de Vida en la sec. 1, art. D(43) de su Reglamento de Subastas. Para calcular el Costo de Ciclo de Vida de un equipo se toman en consideración varios factores, entre ellos, el factor de capacidad.

Hemos considerado el análisis de la prueba llevado a cabo por la agencia sobre este particular en su resolución denegatoria de la impugnación y entendemos que la determinación de la agencia y sus reparos a la metodología y cálculos utilizados por la recurrente para medir el factor de capacidad son razonables. Según surge del expediente, la agencia concluyó que la recurrente había confundido los parámetros de *"ciclo de durabilidad" ("duty cycle")* y *"factor de capacidad" ("capacity factor")*. Según la agencia, el criterio de 7,300 horas de operación, que mencionan citadas las especificaciones en la sección sobre *"Performance Requirements"*, se refería a los requisitos de la durabilidad del equipo y no, como alegó la recurrente, a que las unidades efectivamente habrían de ser utilizadas ininterrumpidamente a toda capacidad *("full capacity")* por 7,300 horas anualmente. No estamos en posición de sustituir esta interpretación.

Según se observara en el dictamen de la agencia, para obtener el factor correcto de capacidad, empleado por el programa, era necesario tener, además, información precisa sobre el costo del combustible que consumirían dichas unidades, y sobre la eficiencia propuesta por cada fabricante en los sistemas de generación, para de esta forma realizar una simulación de un despacho económico dentro del sistema eléctrico de la A.E.E., lo que la recurrente no hizo en sus cálculos. Nos parece razonable el señalamiento de la agencia en su alegato, de que las propias especificaciones de la subasta indicaban que los equipos cesarían de operar cada tres o cuatros días; y que el ciclo de durabilidad de la planta será de siete (7) días, consistente un día de dieciseis (16) horas con todas las turbinas de combustión a toda capacidad, y las restantes ocho (8) horas con una turbina de combustión a toda capacidad, lo que resulta inconsistente con la interpretación de la recurrente. ■

Reconocemos que tal vez las especificaciones de la subasta no fueron claras sobre el particular. ■ No obstante, tratándose de una determinación más bien técnica sobre un aspecto que requiere la interpretación de la agencia sobre las propias especificaciones generadas por ella, no vemos base para intervenir con el dictamen recurrido.

La recurrente plantea que ABENGOA ofreció un equipo denominado *"Selective Catalytic Reduction" ("SCR")* de eficiencia no menor de 50%, cuando se requería un mínimo de 85%. Según se desprende de la resolución recurrida, ABENGOA se comprometió a cumplir con este parámetro a costo nulo y elección de la A.E.E.

La recurrente también plantea que ABENGOA no estaba registrado en el Registro de Proveedores de la Autoridad, según lo exige el Artículo A del Capítulo III del Reglamento de Subastas. Según señala la agencia, este planteamiento no fue levantado por la recurrente en su moción de reconsideración de la adjudicación de la subasta, por lo que debe entenderse renunciado. Véase, *Junta Rel. del Trabajo v. I.L.A.,* 73 D.P.R. 616, 648 (1952). En cualquier caso, según se plantea en el alegato de la A.E.E., ABENGOA sí estaba registrada desde 1989.

La recurrente se queja de que no se le brindó acceso a la propuesta de ABENGOA. Coincidimos con la agencia recurrida, sin embargo, en que la recurrente no tenía derecho a efectuar este tipo de descubrimiento. Cf. 3 L.P.R.A. sec. 2158. No obstante, la recurrente sí tuvo la oportunidad de recibir una explicación de la agencia en torno a los fundamentos de la decisión y a que se ventilaran sus planteamientos en torno a la misma. No entendemos, en estas circunstancias, que hubiera habido violación alguna a su derecho a un debido proceso de ley. ■

Por los fundamentos expresados, se confirma la resolución recurrida.

Lo acordó y lo manda el Tribunal y lo certifica la señora Secretaria General.

Aida Ileana Oquendo Graulau
Secretaria General

**1.** Dicho programa simula un despacho económico de las unidades para determinar así los costos de producción.

**2.** Conforme a General Electric, el factor de capacidad se define como: *"Ratio of actual electricity produced by unit over a period of time, usually one year, compared to the maximum amount of electricity that a unit could produce during that same period. For the San Juan Repowering Project: 1 yr. = 365 days x 24 hrs. = 8760 hrs. Per Volume II, Tab. A., Section: Combustion Turbine/Generator System, Section 3.1, "The equipment will operate twenty-four hrs. per day, for a total of 7,300 operating hours per year. The duty cycle for the equipment shall be operation at full capacity..."*

*Therefore,*

*CF = SJ Repowering hrs. Operation*

*base load or full capacity Maximum amount of electricity one yr.*
$$= (100\%) (7,300 \ hrs.) \ x \ 100$$
$$\overline{\quad\quad\quad\quad\quad\quad\quad\quad}$$
*(100%) ( 8760 hrs.)*

*= 83.3%"*

**3.** Véanse, Carta del 17 de noviembre de 1994, Carta del 27 de enero de l 995 y sus anejos, y Carta del 22 de mayo de 1995.

**4.** Véanse las secciones *"Instrumentation and Control Scope of Work"* y *"Performance Requirements" ("Specification No.TSMP 201 05 94").*

**5.** En su escrito, la recurrente señala que durante el proceso otro de los licitadores, Kiewtt, también le solicitó a la A.E.E. que se aclarara el factor de capacidad a ser utilizado, a lo que la agencia se negó.

**6.** La parte recurrente nos ha solicitado la celebración de una vista, solicitud que ha sido denegada por este Tribunal. No habiéndose celebrado una vista ante la agencia, no vemos base para ampliar el récord en esta etapa. Reconocemos que la controversia envuelve una cuestión técnica y que la interpretación ofrecida por la parte recurrente no es descabellada. No obstante, nuestro rol no es de realizar una determinación independiente, sino de verificar si la A.E.E. actuó dentro de sus facultades al otorgar la subasta. Preferimos hacer dicha evaluación a la luz de los mismos elementos de juicio que la agencia.